**PEOPLE of the STATE of ILLINOIS, Illinois Commerce Commission, John W. McGinnes and George B. Lee, Illinois Department of Transportation, and B & O Concerned Citizens Committee, Petitioners,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents.**

**The Baltimore and Ohio Railroad Company, Intervenor.**

**Nos. 78–1762, 78–2020 and 78–2043.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 29, 1980.

Decided Jan. 20, 1981.

Thomas F. McFarland, Jr., Chicago, Ill., James E. Weging, Asst. Atty. Gen. of Illinois, Chicago, Ill., for petitioners.

Sidney L. Strickland, Jr., I. C. C., Washington, D. C., for respondents.

Before FAIRCHILD, Chief Judge, and SWYGERT and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

In this case, we review the decision of the Interstate Commerce Commission ("ICC") to allow the Baltimore and Ohio Railroad ("B&O") to abandon a railroad line. We find that the ICC's decision was arbitrary and capricious. Further, we find that, under the circumstances of this case, the parties should have been allowed the opportunity for cross-examination regarding supplementary evidence received by the ICC.

I

This is an action to review decisions the ICC issued in Docket No. AB–19 (Sub-No. 27), *Baltimore and Ohio Railroad Company Abandonment Between Flora and Sangamon Junction In Clay, Effingham, Fayette,*

*Shelby, Christian and Sangamon Counties, IL.* The administrative process we review has followed a tortuous course.

By application filed March 17, 1975, the B&O sought a certificate of public convenience and necessity permitting abandonment of a 103.29 mile line of railroad between Flora, Illinois and Sangamon Junction, Illinois ("Flora line"), pursuant to § 1(18) of the Interstate Commerce Act ("IC Act"), 49 U.S.C. § 1(18)–(22), now codified at 49 U.S.C. § 10903–07.[1] This line of track constitutes the middle segment of a 228-mile line of B&O track between Beardstown and Shawneetown, Illinois.

The B&O gave notice of its application to abandon the Flora line as required under the IC Act and the ICC's regulations. The abandonment was opposed by various shippers, public officials, and other interested persons, including the petitioners here: the Illinois Department of Transportation, the State of Illinois and the Illinois Commerce Commission, United Transportation Union, and B&O Concerned Citizens Committee (a group composed of 34 shippers, farm interests, and local community organizations). In October, 1976, the ICC referred the abandonment application to an administrative law judge for hearing and an initial decision. Hearings, in which the parties

had the right of cross-examination, were held during 1977.[2]

In an initial decision, served in November, 1977, and made after eleven days of hearings, the law judge[3] denied the abandonment application, finding that the B&O had failed to meet its burden of proving that the present or future public convenience permitted the abandonment. The law judge made a detailed study of the 1974 and 1975 operating and financial data submitted by the B&O and concluded that the B&O had failed to substantiate several of the costs it had attributed to movement of traffic on the line. Excluding only those unsubstantiated expenses which could be ascertained from the record, the law judge arrived at the following restated historical financial results of B&O's operations on the line. For 1974, the B&O had claimed a net loss of $1,135,691, but the law judge found a net gain of $2,454. For 1975, the B&O had claimed a net loss of $1,108,856, but the law judge found a possible net loss of $18,437. The law judge qualified this figure, however, by finding that, due to the fact that restatement of unsubstantiated expenses claimed could not be determined from the evidence of record, it was questionable whether the B&O sustained any loss at all in 1975. The law judge's decision was 16

1. The provisions governing abandonments and discontinuances of rail service formerly were intermingled in Sections 1(18)–(22) of the IC Act. Congress revised these provisions in 1976 with the enactment of the Railroad Revitalization and Regulatory Reform Act of 1976. P.L. 94–210, 90 Stat. 31, 1976. ("4–R Act") Section 801 of the 4–R Act reenacted the provisions governing the construction and extension of rail service and consolidated them in an amended section 1(18). Sections 1(19) through 1(22) of the IC Act were repealed. Sections 802 and 809 of the 4–R Act consolidated the provisions relating to discontinuance and abandonment of rail service into a new Section 1a of the IC Act. With the enactment of P.L. 95–473 on October 17, 1978, the Congress revised, codified and enacted, *without substantive change*, the IC Act and related laws as subtitle IV of Title 49 of the United States Code. The statutory provisions governing rail abandonments are now codified at 49 U.S.C. §§ 10903–07.

2. Prior to the hearings, the ICC's Section on Energy and Environment issued an environmental threshold assessment survey which

concluded that the proposed abandonment would not constitute a major federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.* Following receipt of comments, the ICC issued an addendum to that survey on September 27, 1976, reaffirming its initial conclusion. By reason of an intervening ICC decision in a related case, *Prairie Trunk Railway—Acquisition and Operation—Between Flora and Shawneetown In Clay, Wayne, White and Gallatin Counties, Illinois,* 348 I.C.C. 832 (1977), a supplemental environmental report was issued on June 2, 1977, in which the ICC reaffirmed its initial conclusion.

3. The administrative law judge who heard the testimony had left the ICC's employ after the hearings were closed but prior to the filing of briefs. The case was referred to another administrative law judge for initial decision.

pages and was supplemented by six appendices totalling 57 pages, including a detailed financial analysis.

On appeal by the B&O, the ICC's Division I reversed. In a seven page decision, Division I accepted the law judge's restated figures but rejected without explanation the law judge's conclusion that those restated figures were insufficient to support the B&O's argument that operating the line caused a financial burden which was more substantial than the impairment of public convenience caused by the abandonment.

Petitioners sought administrative review of the Division I decision. The ICC denied all parties' petitions for administrative review. Petitioners then filed for judicial review of the ICC's decision in this court.

Just prior to the due date for its reply brief, however, the ICC requested a remand of this matter on the grounds that the Division I decision may have contained material error. On January 31, 1979, this court granted the ICC's motion to remand. On remand, the full Commission found that it was unable to decide the matter because the record lacked adequate cost and financial data. The data in the record reflected the financial results of the operation of the line in calendar years 1974, 1975, and the first six months of 1976. The ICC directed the B&O to supplement the information by providing revenue and avoidable cost information for the years 1976, 1977, and 1978. The B&O filed such a supplementary statement. The petitioners appealed the decision to consider this supplemental evidence. The ICC denied those appeals. The petitioners were not afforded the right of cross-examination regarding the supplementary evidence.

On March 3, 1980, the ICC issued its final decision, affirming the June, 1978, decision of Division I granting the abandonment. That ICC decision is the subject of this appeal. The petitioners launch three general arguments against the ICC's final decision. First, petitioners argue that the ICC should not have accepted supplementary evidence for the years 1976–78. Second, petitioners argue that the ICC decision is not

supported by substantial evidence in the record and is arbitrary and capricious. Third, petitioners argue that the ICC should have afforded the parties the opportunity for cross-examination regarding the supplementary evidence received. We find that: the ICC properly received the supplementary evidence; the final decision was arbitrary and capricious; and the parties should have been afforded the opportunity for cross-examination.

## II

 We begin with the use of supplementary evidence. In an abandonment application, the applicant has the burden of proof to show that abandonment of the rail line is consistent with the present and future public convenience and necessity. 49 U.S.C. § 10904(b) (1978). The petitioners argue that the fact that the ICC was unable to decide the abandonment case on the basis of the 1974–76 data proves, as a matter of law, that the B&O failed to carry its burden of proof.

Petitioners base their argument on two grounds. First, they point out that the ICC's abandonment regulations require the filing of financial results and other evidence for two calendar years prior to the filing of the abandonment application. Second, they argue that financial results of operations after the filing of an abandonment application are inherently nonrepresentative. This second argument is relevant to the weight to be given to the evidence, and is discussed in Part IV of this decision. But even if the evidence is nonrepresentative, we are not persuaded that the ICC cannot, as a matter of law, take additional evidence.

ICC regulations require an applicant for abandonment to submit operating data with regard to the two years prior to the filing of the abandonment application. 49 C.F.R. § 1121.32(c), (d)(2), (4), (5). But nothing in the statute, regulations, or case law prohibits the ICC from requesting and accepting new evidence when, because of the administrative process described above, the evidence before it was three years out of date.

Although no case has been cited by the parties which interprets whether the two-year evidence regulation is meant to preclude additional evidence in circumstances similar to the case at bar,[4] it is clear that the IC Act specifically allows the ICC to reopen a rail carrier proceeding or to grant a rehearing "at any time on its own initiative" because of new evidence or substantially changed circumstances. 49 U.S.C. § 10327(g)(1)(1978). Here, since the information regarding the line was three years old, the updated information satisfies either of the requirements of new evidence or substantially changed circumstances.

Furthermore, the Supreme Court has held that reopening of a case for further evidentiary hearing is a matter entrusted to an agency's broad discretion and has declined to interfere with an agency's judgment. *See Bowman Transp. v. Arkansas-Best Freight System*, 419 U.S. 281, 294–95, 95 S.Ct. 438, 446, 42 L.Ed.2d 447 (1974); *American Farm Lines v. Black Ball Freight*, 397 U.S. 532, 540–41, 90 S.Ct. 1288, 1293, 25 L.Ed.2d 547 (1970); *I.C.C. v. Jersey City*, 322 U.S. 503, 516–17, 64 S.Ct. 1129, 1135, 88 L.Ed. 1420 (1944). For the above reasons, we are unable to find the ICC's action in requesting and receiving supplementary evidence was improper.

### III

The petitioners' second argument is actually two arguments: that the ICC's final decision was unsupported by substantial evidence in the record and was arbitrary and capricious. To consider whether we can reach these arguments, we must first determine the appropriate standard of review. *See Citizens To Preserve Overton Park v. Volpe*, 401 U.S. 402, 413–14, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971). The standards of judicial review are set forth in § 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, which states that a "reviewing court . . . shall hold unlawful and set aside agency action, findings, and conclusions found" not to meet six separate standards. Of these six standards, four apply to all cases. Any agency action is to be set aside if it is (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if the action fails to meet: (2) constitutional, (3) statutory, or (4) procedural requirements. 5 U.S.C. § 706(2)(A), (B), (C), (D). The remaining two standards only apply to certain narrow situations. Standard (5) provides that action which is "unsupported by substantial evidence" is to be set aside only in "a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute". 5 U.S.C. § 706(2)(E). Finally, (6) a court must set aside agency action which is "unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." 5 U.S.C. § 706(2)(F).

Since the "arbitrary and capricious" standard applies to all cases, it is clear we must review the ICC's final decision by this standard. But it is not clear whether we also are to review that decision by the "substantial evidence" standard. The touchstone of whether the substantial evidence standard applies is whether this case is (1) subject to sections 556 and 557 of the APA or (2)

---

4. The ICC argues that the two year requirement was made not because post-application data is inherently nonrepresentative, but merely to ensure that information before the ICC is up-to-date. In support of this argument, the ICC cites *Abandonment of Railroad Lines and Discontinuation of Service*, 354 I.C.C. 542, 547 (1978):

> Our objective in requiring the revenue and cost data in section 1121.32(d) was to obtain a concise, up-to-date picture of the financial condition of the line proposed for abandonment, and its effect upon the railroad.

On the basis of this language, the ICC argues that its decision to obtain additional evidence was consistent with the purpose of its rules: to make decisions on the basis of the most up-to-date revenue and cost information available.

But the issue before the ICC in the cited passage was the use of *pre-application base year* data as opposed to *pre-application calendar year* data. No issue was presented concerning the use of *post-application* data to determine a burden on interstate commerce, or for any other purposes. Thus, the case does not stand for the proposition that the ICC's reliance on post-application data is consistent with the ICC's regulation requiring the filing of pre-application operating results.

"reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706(2)(E).

Section 557 of the APA only applies when a hearing is required by § 556; § 556 sets forth the rules for hearings required by §§ 553 and 554. Section 553 applies to rule making and § 554 applies to adjudication. Since this case involves an adjudication,[5] the question becomes whether this case is covered by § 554 or whether this case is "otherwise reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706(2)(E). But both of these criteria are the same because § 554 only applies to certain cases "of adjudication required by statute to be determined on the record after opportunity for an agency hearing." 5 U.S.C. § 554. Thus, we may use the substantial evidence standard of review only if agency hearings in railroad abandonment cases are required by statute.

We now turn to the railroad abandonment statutes, 49 U.S.C. §§ 10903–04. Section 10903(a) states that the ICC can grant abandonment only if it finds that the "present or future public convenience and necessity" requires or permits the abandonment. 49 U.S.C. § 10903(a). Section 10903(a) then states that, in making this finding, the ICC shall consider whether the abandonment will have a serious, adverse impact on rural and community development. Section 10904(c)(1) provides that the ICC, in considering the public convenience,

"shall, on petition, and may, on its own initiative, begin an investigation to assist it." 49 U.S.C. § 10904(c)(1). As to the use of a public hearing in such an investigation, the statute provides: "An investigation may include public hearings.... The hearing may be held on the request of an interested party or on the initiative of the Commission." 49 U.S.C. § 10904(c)(1). Because of the use of the word "may", it appears that the ICC is not required by statute to hold a hearing on an abandonment application. Thus, the requirement for the use of the substantial evidence test is not met.

In this case, the parties did not argue the applicability of the substantial evidence test. The ICC apparently conceded the test was applicable. ICC Br. at 12. Moreover, we have discovered a recent railroad abandonment case where the substantial evidence standard was used by the reviewing court. *Concord Township, et al. v. United States*, 625 F.2d 1068, 1072–73 (3d Cir. 1980). But the *Concord Township* court did not discuss its decision to use the substantial evidence test. It may have been that the question there was also not disputed by the parties. Based on our analysis, we have doubts regarding the applicability of the substantial evidence standard. Because this issue was not litigated, we decline to use that standard and we review the ICC's decision solely in terms of the "arbitrary and capricious" standard.[6]

---

5. Because the ICC's decision was made on the basis of specific financial and operating information regarding the Flora line, 360 I.C.C. 682–83, this proceeding seems to be an adjudication rather than one involving rule making. *See* note 7 *supra*. Moreover, § 553 only requires a hearing when "rules are required by the statute to be made on the record after opportunity for an agency hearing." 5 U.S.C. § 553(c). This standard is the same used by § 554.

6. It may be that the difference in review standards is primarily semantic. As the District of Columbia Circuit Court of Appeals recently stated:

As a matter of practicability, it may not much matter how reviewing courts choose to label the tests they apply. Labels, experience tells us, seldom have much analytical utility and just as often may lead judges into a semantic Serbonian Bog. While an adverse

action supported by substantial evidence of record may still be arbitrary and capricious, *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974), for instance if there is no rational connection between the grounds charged and the interest assertedly served by proceeding against the employee, *see, e.g., Norton v. Macy*, 417 F.2d 1161 (D.C.Cir.1969); *Mindel v. Civil Service Comm'n*, 312 F.Supp. 485 (N.D.Cal. 1970); *but see Alsbury v. United States Postal Service, supra*, 530 F.2d at 856 ("dismissal was supported by substantial evidence and thus was neither arbitrary nor capricious"), an action that is not arbitrary or capricious logically must have some if not substantial evidentiary support in the record.
*Doe v. Hampton*, 566 F.2d 265, 271–72 n.15 (D.C.Cir.1977).

The primary requirement of the "arbitrary and capricious" standard of review is the "simple but fundamental rule of law" that an "agency must set forth clearly the grounds on which it acted." *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 807, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1972). While we accord full deference to the expertise and discretion of the ICC and the presumptions to which its actions are entitled by law, this deference is not intended to shield the agency's action "from a thorough, probing, in-depth review." *Overton Park*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136. As the court in *National Crushed Stone Ass'n v. E.P.A.*, 601 F.2d 111, 116 (4th Cir. 1979), *cert. granted*, 444 U.S. 1069, 100 S.Ct. 2982, 64 L.Ed.2d 852 (1980), stated, "[c]ourts are no longer satisfied with bare administrative *ipse dixits* and the [a]gency must make reasoned decisions with full articulation of the reasoning and take into account all relevant factors."

Under the arbitrary and capricious standard, the scope of our review, although relatively narrow, is to be "searching and careful." *Bowman Transp. v. Arkansas-Best Freight System*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974). This court, of course, cannot substitute its judgment for that of the ICC. *Id.* But we must consider whether the ICC's decision "was based on a consideration of the relevant factors and whether there were any clear errors of judgment. *Id.*, quoting *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823. "The agency must articulate a 'rational connection between the facts found and the choices made.'" *Id.*, quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962).

Two important considerations in defining the degree of precision required in an agency's statement of reasons are first, whether the decision is "legislative" or "adjudicative" and, second, whether the agency's final decision differs from the decision made by its fact-finder. With regard to the first consideration, to the extent that an agency is dealing with broad "legislative" policy questions, it need not respond in detail to all issues. But when confronted with "adjudicative" questions based on a determination of particular facts, the agency must clearly address the specific legal and factual issues raised. *Harborlite Corp. v. I.C.C.*, 613 F.2d 1088, 1092 (D.C.Cir.1979). In the case at bar, this abandonment application is an adjudicative issue involving specific financial information of the operations of the Flora line.[7] Therefore, it is important that the ICC clearly address the precise issues raised by the petitioners.

The second consideration regarding the degree of precision required in an agency decision is whether that decision differs from the decision of the agency's factfinder. *See N.L.R.B. v. P.P.G. Industries, Inc.*, 579 F.2d 1057, 1058 (7th Cir. 1978). In the case before us, the ICC relies on facts determined by the law judge, but then draws a conclusion diametrically opposed to that of the law judge. Although the agency certainly may draw a differing conclusion, it is important for the agency to clearly explain the nature and rationale of its differing conclusion.

The ICC seems to argue that it is not required to explain its departure from the

---

7. The Supreme Court has emphasized that there is:

> a recognized distinction between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other.

*United States v. Florida East Coast Ry. Co.*, 410 U.S. 224, 245, 93 S.Ct. 810, 821, 35 L.Ed.2d 223 (1973). *See also Independent Bankers Assn. of Georgia v. Federal Reserve System*, 516 F.2d 1206, 1216 & n.26 (D.C.Cir.1975).

The parties did not dispute the question of whether the relevant facts were "adjudicative". The ICC's final decision indicates that the abandonment decision was based on the specific factual issues related to the income of and operations on the Flora line for the years 1974–78. 360 I.C.C. at 682–83. Special emphasis was placed on the years 1976–78. *Id.* Thus, the outcome of the case seemed to depend on the resolution of specific adjudicative facts. *See generally Independent Bankers*, 516 F.2d at 1215.

decision of the law judge, relying on § 557(b) of the APA, 5 U.S.C. § 557(b); *N.L.R.B. v. Interboro Contractor's Inc.*, 388 F.2d 495, 499 (2d Cir. 1967); *Bangor & Aroostook R.R. v. I.C.C.*, 574 F.2d 1096, 1110 (1st Cir. 1978); *Colorado Interstate Gas Co. v. Federal Power Commission*, 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945); *Bowman Transp.*, 419 U.S. at 285, 95 S.Ct. at 441; *Colorado v. United States*, 271 U.S. 153, 169, 46 S.Ct. 452, 456, 70 L.Ed. 878 (1926); and *Minneapolis & St. Louis R.R. v. United States*, 361 U.S. 173, 193, 80 S.Ct. 229, 241, 4 L.Ed.2d 223 (1959). But the very statute and cases upon which the ICC relies either support, or are not inconsistent with, our conclusion that an agency must clearly explain a decision that differs from a fact-finder's decision.

Although § 557(b) of the APA states that when an agency reviews an initial decision of a presiding officer, it has all the powers that it would have if it were making the decision in the first instance, it does *not* state that the agency need not clearly and precisely explain the reason for its different conclusion. Indeed, § 557(c) specifically requires a statement of reasons for an agency's findings and conclusions.

**8.** Both the *Interboro* and *PPG Industries* courts were considering the "substantial evidence" standard when they held that the courts must look more critically at an agency's decision which differed from the decision of its fact-finder. But if the agency's differing decision may be more suspect as lacking substantial evidence, it is all the more important that the agency clearly and precisely explain the nature of its differing decision. Therefore, these decisions are consistent with our holding that a clear explanation of the rejection of a fact-finder's initial decision is required under the "arbitrary and capricious" standard.

**9.** In *Colorado v. United States*, 271 U.S. 153, 169, 46 S.Ct. 452, 456, 70 L.Ed. 878 (1926), the Court was confronted with a challenge to an abandonment application where there was an extensive record, but where the ICC had not made specific findings regarding prejudice against interstate or foreign commerce or profits received by the railroad. Although the *Colorado* Court did say that no specific findings regarding effect on interstate commerce and profitability were required, the Court emphasized that the record had been substantial and that "no relevant fact was ignored." 271 U.S. at 169, 46 S.Ct. at 456. As will be discussed,

The cases cited by the ICC are equally unavailing. In fact, the *Interboro* decision, selectively quoted by the ICC, directly supports the petitioners. To be sure, the court stated that an agency may reject an examiner's findings, even though not clearly erroneous. 388 F.2d at 499. But the *Interboro* court emphasized that a reviewing court must look much more critically at such a decision than a decision consistent with an examiner's findings. *Id.* Accord, *N.L.R.B. v. P.P.G. Industries, Inc.*, 579 F.2d 1057, 1058–59 (1978).[8]

The ICC relies on *Colorado Interstate Gas Co. v. Federal Power Commission*, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206 (1945), but the situation there did not even involve a difference between the Commission and a fact-finder. Indeed, the Court refused to overturn findings which were quite summary *because* those findings had incorporated by reference the staff's exhibits on allocation of costs. 324 U.S. at 595, 65 S.Ct. at 836. There was no suggestion of disagreement with the staff's findings or the conclusions to be drawn from those findings. The ICC's reliance on other cases cited above is equally misplaced.[9] Thus, we

one of the petitioners' arguments in this case is that many relevant facts *were* ignored in the ICC's final decision. Thus, the *Colorado* decision is not applicable to this case.

Similarly, the decision in *Minneapolis & St. Louis R.R. Co. v. United States*, 361 U.S. 173, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959), upon which the ICC relies, is also unavailing. The *Minneapolis & St. Louis* Court merely held that the Commission need not make findings on every subordinate contention advanced, but must make findings on "those issues of fact, law, or discretion which are 'material'." 361 U.S. at 193–94, 80 S.Ct. at 241. Indeed, the *Minneapolis & St. Louis* Court found that the record showed the Commission did consider the material facts, even where no specific finding was made. *Id.* at 194, 80 S.Ct. at 241.

The result in the case of *Bangor & Aroostook R.R. v. I.C.C.*, 574 F.2d 1096 (1st Cir. 1978), is also similar. The *Bangor & Aroostook* case involved interchange agreements in which another railroad sought damages from the Bangor & Aroostook. The ICC accepted the administrative law judge's determination on the question of liability, but the ICC assessed damages at a lower rate than did the law judge. The court properly held that the Commission was

reject the ICC's argument that it is not required to explain its departure from the differing decision of the administrative law judge in this case. Indeed, we hold that because the law judge's conclusion was specifically and directly related to his financial findings, the ICC must clearly and precisely explain its differences from that decision where it accepts the financial findings but rejects the conclusions drawn from those findings.

## IV

■ Having summarized the appropriate scope of review, we now proceed to consider whether the ICC's decision was arbitrary and capricious. The statutory standard governing the abandonment decision is whether the present or future public convenience and necessity requires or permits the abandonment. 49 U.S.C. § 10903(a). In making this determination, the ICC must balance the present and prospective need

for the line against any burden on interstate commerce from continued operation of the line. *Colorado v. United States*, 271 U.S. 153, 168–69 (1926). The burden of proof as to public convenience and necessity is specifically placed by the IC Act upon the railroad applying for abandonment. 49 U.S.C. § 10904(b). Simply stated, the fundamental contested issue in this proceeding has been whether the Flora line has been and will continue to be operated at a financial loss.

On remand from this court, the ICC issued a three page opinion which concluded that continued operation of the Flora line is a burden on interstate commerce and that this burden outweighs any inconvenience to shippers. 360 I.C.C. at 681. In making its final decision, the ICC had before it the findings and conclusions of the law judge and of its Division I as well as supplemental evidence. The ICC had admitted that its Division I decision might have been erroneous and could not be relied upon. The ICC

free to reject the law judge's conclusion and arrive at its own assessment of damages. But the decision clearly showed that the Commission had specifically explained the basis of its calculations and the reasons why it differed from the law judge. *Id.* at 1109–12. Thus, the *Bangor & Aroostook* case did not reject the proposition that, where the Commission differs from the law judge, it must clearly and precisely state the reasons for its difference.

The *Bangor & Aroostook* court did state that an administrative law judge's decision, except on matters of credibility, "is due little deference when the Commission has made an independent evaluation that is substantially supported by the evidence." *Id.* at 1110. For several reasons, this statement is not persuasive in suggesting that, in the case at bar, the administrative law judge's decision is due little deference when compared to the ICC's final decision.

First, as has been noted, the *Bangor & Aroostook* court suggests that deference need not be accorded to the law judge's decision *only* when the agency has issued an opinion which clearly indicates that an independent evaluation was made and which specifies the details of that evaluation. Second, the *Bangor & Aroostook* decision does not indicate to what extent there was an inconsistency between accepting the law judge's determination regarding liability and lowering the law judge's determination of damages. It is quite possible that the two issues were independent and that there was no serious inconsistency. But in the case at bar, there appears to be a serious inconsistency

between accepting a law judge's decision regarding financial information and then rejecting his conclusion based on that financial information. Finally, to the extent there remains a conflict between our view of the proper deference to be accorded a law judge's decision, expressed in *N.L.R.B. v. P.P.G. Industries, Inc.*, 579 F.2d 1057, 1058 (7th Cir. 1978), and the view of the First Circuit Court of Appeals expressed in *Bangor & Aroostook*, our view is more in accord with the need for a "searching" judicial review. When, as here, the law judge's decision is thorough and based on specific financial findings, the ICC must carefully and precisely explain any decision which accepts those findings but rejects the conclusion.

Finally, the ICC relies on *Bowman Transp., supra*, 419 U.S. at 285–86, 95 S.Ct. at 441–42; for the proposition that so long as the agency's path is discernible and the Commission's findings are not so vague as to make judicial review perfunctory, the court should affirm challenged decisions. But the *Bowman* Court also stated that judicial review must be "searching and careful." *Id.* The real question, of course, is where the line must be drawn between a perfunctory review and a careful one. Nothing in the *Bowman* decision suggests that the agency can avoid articulating a " 'rational' connection between the facts found and the choice made," *id., quoting Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962).

final decision, although addressing the same issues before the law judge, made no reference to the differing findings and conclusions of the law judge and made only slight references to the record of the case developed over eleven days of hearing. In the final opinion, the ICC did admit that the B&O had earned a profit in 1975. 360 I.C.C. at 682. The ICC's decision to allow abandonment rested solely on its findings, based on the supplementary evidence received, that the B&O had net operating losses of $32,695, $492,279, and $276,374 for the years 1976, 1977 and 1978, respectively. 360 I.C.C. at 683.

The ICC final decision calculating these losses made conclusions regarding four issues: rehabilitation costs, maintenance expenses, system line financial information, and the impact of abandonment on the B&O's net operating income. Petitioners primarily [10] attack the conclusions regarding maintenance expenses and the impact of abandonment.

In its final decision, the ICC found that from 1974 through 1978, the B&O had

maintenance-of-way expenses averaging $3,583 per mile. The ICC stated without elaboration that these expenses were "reasonable".[11] That these maintenance costs were included in the determination of the financial "bottom line" of the B&O for the years after 1977 is very important to the ICC's subsequent determination that the B&O operated at a loss during these years. The average maintenance expenditures for 1977–78 exceeded the average of such expenditures in 1974–75 by $313,031 per year.[12] This added maintenance cost exceeded the loss of $276,374 found for 1977 and would greatly reduce the loss of $429,279 found for 1978.

There are two major problems with the ICC's finding of "reasonableness". First, the finding consists solely of a conclusory statement. The ICC did not state why the expenses are reasonable.[13] Second, the ICC did not respond to petitioners' argument that the maintenance costs incurred after 1976 were the result of the B&O's failure to perform adequate maintenance in the past [14] and that the ICC has a clear policy of

---

**10.** The ICC's discussion regarding rehabilitation costs is less than clear, and there is some challenge by petitioners to the ICC's conclusion. The ICC stated that the petitioners challenged $90,000 of rehabilitation costs included in the computation of the B&O's net 1975 income. But the petitioners actually challenged the failure of the ICC to consider the omission of $90,000 in net system line income.

A possible explanation for the confusion is that the ICC was responsive to the petitioners' argument but incorrectly termed the $90,000 item a cost item rather than a system revenue item. The ICC did restate, in its final opinion, the 1975 financial figure by $90,000 to show that the B&O earned a net profit of $71,563. Thus, any technical misidentification does not seem prejudicial because the ICC reached the result requested by petitioners: the financial statement for 1975 was adjusted by $90,000 to show a profit of approximately $72,000.

**11.** The ICC stated:
 B&O's expenses to maintain the line are reasonable. The record indicates that from 1974 through 1978 B&O had maintenance expenses on a per-mile basis ranging between $1,753 (1974) and $5,763 (1977) and averaging $3,583 over the 5-year period. These are reasonable expenses for operations

at FRA class I safety standards. Considering the railroad operates the branch line at FRA class III safety standards, we find these maintenance costs are reasonable.
 360 I.C.C. at 682.

**12.** The ICC did not discuss the calculation of maintenance costs or even itemize those costs. Presumably, it accepted the costs submitted by the B&O in its supplemental financial information, as follows: 1974, $181,028; 1975, $230,795; 1976, $400,355; 1977, $595,262; 1978, $442,622. Supp.App. at 52.

**13.** The ICC does state that the expenses would be reasonable under either FRA class I or FRA class III safety standards, but does not state why they would be reasonable. 360 I.C.C. at 682. It is unclear whether petitioners challenge the ICC finding that the B&O operates the line at FRA Class III safety standards.

**14.** Petitioners allege that the substantial increase in maintenance costs was due in large part to increased expenses for tie replacement and track rehabilitation after years of neglect. The supplemental information supplied by the B&O indicates that tie expenses were as follows:

disallowing such expenses. Had these expenses been disallowed here, there would have been no finding of a loss for any year except 1977, the year in which the record showed that the traffic of the largest shipper on the line was affected by a five month strike. Because of the importance of the maintenance expenses to the calculation of "loss", the ICC's failure to respond to this argument regarding maintenance expenses constitutes material error.

Intervenor B&O attempts to rationalize the ICC's decision on a ground relating to track maintenance expense which was not relied on by the ICC. B&O argues that had it spent more for maintenance during 1974–75, i.e., had it performed "normalized maintenance"[15] during those years, those expenses would have changed the financial outcomes from profits to losses.

■■■ First, this court cannot accept appellate counsel's *post hoc* rationalizations for agency action. If an agency's order is upheld, it must be on the same basis articulated in the order by the agency itself. *F.P.C. v. Texaco, Inc.*, 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). Second, as stated in the Division I opinion, the ICC's policy is not to consider "normalized maintenance" expenses in lieu of actual expenses. 354 I.C.C. at 799–800, No. AB–19 (Sub-No. 27) at 2.[16] For the above reasons, we find that the ICC's conclusion that the maintenance expenses submitted by the B&O were "reasonable" was arbitrary and capricious.

| Year | Maintenance of Way Expenses | Tie Expenses | |
|------|------|------|------|
| 1974 | 181,028 | 0 | (0%) |
| 1975 | 230,795 | 13,029 | (5.6%) |
| 1976 | 400,355 | 141,313 | (35.2%) |
| 1977 | 595,262 | 248,688 | (41.8%) |
| 1978 | 442,622 | 246,312 | (55.6%) |

Supp.App. at 52.

15. "Normalized maintenance" is the average annual cost of continuing a line in operation on a long-term basis. It is computed by separate-

■■ Petitioners next challenge the ICC's findings regarding the impact of proposed abandonment. The ICC authorized abandonment because it found that abandonment would reduce the "drain" on B&O's net operating income caused by operation of the Flora line. 360 I.C.C. at 683. It concluded that the B&O was sustaining a loss from operating the line and that the line did not generate and, because future traffic was speculative in nature, would not generate, sufficient traffic to justify further operations. *Id.* In reaching these conclusions, the ICC relied on the supplementary evidence submitted by the B&O indicating that the Flora line created net operating losses of $32,695, $492,279, and $276,374 in 1976, 1977 and 1978, respectively. *Id.*

Petitioners raise several challenges to these conclusions by the ICC. First, petitioners argue that results of operating the line subsequent to the filing of the abandonment application are, by their very nature, nonrepresentative of normal operations on the line. In support of this argument, they correctly point out that the ICC's abandonment regulations require the filing of financial results for two calendar years prior to the filing of the abandonment application, 49 C.F.R. § 1121.32(c), (d)(2), (4), (5), and argue that the ICC's requirement recognizes that such "pre-application" operations are usually reasonably representative of normal operations on the line.

The ICC responds that data after the abandonment application is as reliable as pre-application data because, under the ICC's abandonment regulations, it is known in advance of the application that a line is going to be subject to abandonment. In support of that argument, the ICC states

ly taking each of the various components used in the construction of a track, determining the current replacement cost in kind, less current salvage value, and dividing by the expected service life. *New York, N.H.&H. R. Co. Abandonment*, 324 I.C.C. 345, 351 n.9 (1965).

16. *See also State of Maine Dept. of Transp. v. I.C.C.*, 587 F.2d 541, 542 n.1 (1st Cir. 1978); *New York, N.H. & H.R. Co. Abandonment*, 324 I.C.C. 345, 351–52 (1965).

that 49 C.F.R. § 1121.20(b)(1) "require(s) the railroad to identify a line as a potential candidate for abandonment in its system diagram map three years prior to the filing of an abandonment application." ICC Br. at 19. But the ICC has materially misstated the cited regulation. There is no requirement that a line appear as a candidate for abandonment for three years prior to the filing of an abandonment application. The requirement is that the railroad identify lines which it anticipates will be the subject of an abandonment application "within the 3-year period following the date upon which the diagram . . . is filed with the Commission." 49 C.F.R. § 1121.20(b)(1). Such a line need appear on the diagram map for only *four months* prior to the filing of an abandonment application. 49 C.F.R. § 1121.23(d). Contrary to the impression the ICC seeks to create, it need be known for only four months prior to the filing of an abandonment application that a railroad will attempt to abandon a line. Thus, the cited regulation would affect only four months of the representativeness of evidence of operating results for the two calendar years prior to the filing of the abandonment application. Moreover, the cited regulation does not indicate, in any way, that the ICC's reliance on "post-application" data is justified.

Petitioners also argue that post-application data is inherently nonrepresentative because, in the process of applying for abandonment, a railroad becomes committed to abandonment and provides poorer service than previously. Although we find that financial information for the years subsequent to the abandonment application can be considered in evidence, as discussed in Part II, we also recognize obvious problems with the representativeness of that evidence. In this case, that financial information will reflect data of operations on the line after the B&O told shippers it was abandoning the line; after it filed and vigorously sought approval of the abandonment application; after Division I had approved abandonment; and after that approval was published, but not yet implemented, pending judicial review. Petitioners argue that while an abandonment application is pending, shippers are hesitant to expand facilities and rail shipments for fear that rail service might be lost. Petitioners also argue that a railroad seeking abandonment is unlikely to continue the quality of service provided before the abandonment application and that such poorer quality rail service would further discourage rail traffic. The fact that these arguments are substantial is demonstrated by the fact that, in the initial decision, the law judge found that the B&O had diminished services and had, in effect, caused its own losses on the Flora line. ICC No. AB–19 (Sub-No. 27), slip op. at 1074, 1075.[17]

Second, petitioners argue that the record on reopening confirms the nonrepresentative character of the post-application financial data. As discussed earlier, petitioners argue that maintenance expenses increased after the application because the B&O was forced to undertake a major track rehabilitation project in order to cure the effects of neglected track maintenance during the period 1968–75. Petitioners also argue that the B&O has continued to discourage service while this matter has been under ap-

---

17. The law judge found:

Although the B & O has stated that in the past two and one-half years it has been operating at an annual deficit of approximately $1.1 million, there is also evidence in the record showing that from 1974 to 1975 there was a 35 percent increase in tonnage handled on the line. There is evidence of demonstrating that the railroad has diminished service and in effect caused these losses. [sic] In two instances, the B & O refused to provide 65-unit car rates to two of the Protestants. This traffic would have provided the B & O

with additional substantial revenues. If the B & O had truly been interested in acquiring additional traffic and bolstering its profits, it would not have refused such traffic. Furthermore, there is evidence to show that the B & O realistically has the potential of acquiring an additional 34,000 carloads per year of traffic in the involved area. Hence, it is concluded that the B & O could have prevented these losses and could be operating profitably.

I.C.C. No. AB–19 (Sub-No. 27), slip op. at 1074, 1075.

peal.[18] Last, petitioners argue that the data for 1977 is nonrepresentative because the traffic of the largest shipper on the line was adversely affected by a five month strike. As discussed earlier, if the above average maintenance expenses are discounted, 1977 is the only year in which the Flora line suffered a loss.

These challenges to the post-application financial evidence are vital and serious. In its decision reopening the matter, the ICC stated that it would "give appropriate weight" to the updated financial evidence in its decision on the merits.[19] But the final order contains no discussion whatsoever of the appropriate weight to be given to this evidence. The ICC apparently gave the B&O's supplementary evidence great, indeed determinative, weight without so much as a word of discussion concerning the representative character of that evidence.

In its brief, the ICC responds that any downgrading of service by the railroad after application for abandonment is inconsistent with the B&O's legal obligation to continue to provide service. The ICC states that evidence of such downgrading may be introduced by petitioners as factors weighing against a grant of abandonment. ICC Br. at 19. That is precisely what petitioners have done in this case. But the ICC has ignored the petitioners' protests. As Commissioner Clapp, dissenting from the ICC final decision, pointed out, the ICC disregarded, and Division I dismissed with a single sentence, the law judge's finding that the B&O had downgraded the line. 360 I.C.C. at 684. Thus, although the ICC did have the discretion to receive additional evidence, its refusal to consider the serious challenges to that evidence was arbitrary and capricious.

Petitioners next challenge the ICC's predictions regarding future traffic. First, they challenge the ICC conclusion that the evidence of cars handled post-1975 bore out the Division I finding that future traffic prospects were speculative. The ICC relied for its conclusion on its finding that the B&O did not handle a sufficient number of cars to "break-even".[20] The ICC did not discuss how it calculated the break-even point. Presumably, the calculation of cars required to break even was based on the calculation of operating net income or loss. But since there are serious challenges, discussed above, to the operating financial figures, the break-even point calculations must be subject to those same challenges. In addition, petitioners launched a detailed attack on the original finding by Division I that future traffic prospects were speculative.

More importantly, petitioners argue that the ICC's finding that prospects of future traffic are "speculative" is erroneous because the ICC failed to take account of evidence which showed: (a) the number of carloads in 1977–78 was affected by a five month strike in 1977 at the plant of the largest shipper on the line; (b) the B&O continued to fail to supply sufficient freight cars to permit additional shipments; (c) the pendency of the abandonment application caused some shippers to use other means of transportation; and (d) traffic on the line was growing, particularly originating and terminating traffic.

---

18. *See, e.g., Supplemental Verified Statement of Ian C. Muir in Behalf of Continental Grain Company,* Supp.App. at 74 ("First and foremost, our elevator suppliers have been unable to obtain empty cars and have been reluctant to commit to firm sales without evidence of ability to move the beans.").

19. The ICC stated:
We also find that the contentions of the parties deal with the weight of the evidence rather than its admissibility. However, we will give appropriate weight to the evidence in our subsequent consideration of the merits of this case.

I.C.C. No. AB–19 (Sub-No. 27), Supp.App. at 55.

20. The ICC final decision arrives, without explanation, at the following comparison of cars needed in order to "break even" and cars actually handled:

| Year | Cars Required to Break Even | Cars Handled |
|---|---|---|
| 1976 | 3,886 | 3,610 |
| 1977 | 4,670 | 2,725 |
| 1978 | 3,622 | 2,504 |

360 I.C.C. at 683.

The ICC final decision does not contain one word in response to these arguments. As Commissioner Clapp, dissenting, stated, "[b]oth the division and the majority decisions also disregard all testimony regarding current and potential traffic and the railroad's lack of interest." 360 I.C.C. at 684.[21] Certainly this court should not—and cannot—substitute its judgment for that of the ICC. But this court can require that the ICC present a reasoned decision that fairly and adequately addresses the complex issues and arguments of the parties before it. That, the ICC has not done. Because of the evidence and issues ignored by the ICC, we hold that its findings regarding future traffic are arbitrary and capricious.

▮ With regard to the issue of alternate transportation for rail shippers, the ICC's final decision and the Division I decision merely recite the same phrase: the ICC has weighed the inconvenience to the shippers from "incurring higher costs of alternative transportation." 360 I.C.C. at 683.[22] Both decisions wholly ignored petitioners' arguments that substantial evidence existed to show that: (a) alternative transportation was inadequate to accommodate the volume of grain and fertilizer that would be displaced by abandonment, (b) highways and bridges in the area are inadequate to accommodate the truck traffic necessary to pick up a part of that displacement, and (c) grain shippers relegated to truck transportation cannot remain competitive with rail-served grain shippers. No findings of fact were made in either decision. Neither the full ICC nor Division I gave any rationale for how they reached their identically stated conclusions. Thus, because the ICC failed to articulate any findings of fact or a reasoned basis for its conclusions, its conclusions regarding alternative transportation are arbitrary and capricious. *See Harborlite Corp. v. I.C.C.,* 613 F.2d 1088, 1099–1100 (D.C.Cir.1979).[23]

---

**21.** Commissioner Clapp continued:

> Dismissed as irrelevant, for example, was testimony of agricultural shippers that although additional grain traffic is available, they were and are unable to get cars. While I understand the perennial shortage of grain cars during the peak season, this cannot be used as an excuse to justify abandonment. The B&O, in at least one instance, ignored a potential shipper's repeated request for information and assistance (Tr. 701). Considering the downgrading, lack of service, and inability of shippers to get cars, I am not surprised that the number of cars handled by B&O has declined rather than risen. Further, I suggest that the protestant shippers have cause for concern when we make statements as "[p]rospects of future traffic, all agricultural, are based on mere speculation," and "the speculative nature of future traffic (none of which is industrial in nature)...." 354 I.C.C. at 802.

360 I.C.C. at 684 (Clapp, C., dissenting).

**22.** *Compare* the entire discussion of this issue in the two opinions. The ICC final decision states:

> Considering the additional financial information, we have weighed the convenience to the shippers from not having to incur higher costs of alternative transportation against the limited amount of traffic handled by B&O in the past and the speculative nature of future traffic, and B&O's loss from operating the line, *see Colorado v. United States,* 271 U.S. 153, 168, 46 S.Ct. 452, 455, 70 L.Ed. 878

(1926). We conclude that the burden on interstate commerce outweighs any inconvenience to the shippers and, therefore, we affirm division I's grant of the abandonment. 360 I.C.C. at 683.

The Division I final opinion states:

> Weighing the inconvenience to the shippers from incurring higher costs of alternative transportation against the limited amount of traffic handled by B&O in the past and the speculative nature of future traffic (none of which is industrial in nature), and B&O's loss from operating the line, we believe that the burden on interstate commerce outweighs any inconvenience to the shippers. Therefore, we have granted the abandonment.

I.C.C.No. AB–19 (Sub-No. 27) at 5, App. 125.

**23.** The *Harborlite* court stated:

> This sort of precipitant assertion by an administrative agency does little to aid a court in its task of reviewing the complex issues of mixed law and fact that often arise from administrative adjudication. We are not given a glimpse of any of the thoughtful reasoning that might lie behind the agency's inscrutable statement. This type of agency decisionmaking can only frustrate the courts assigned the difficult task of review and burden the agency itself with the additional work necessitated by a remand. In the place of the conclusory statement offered here by the Commission,
> [w]hat we contemplate is that the [agency] will identify, and be reviewed on the basis of

At oral argument, petitioners raised another challenge to the ICC's findings. On September 23, 1980, the ICC announced approval of the merger application of the Chessie System and the Family Lines railroads. *CSX-Control-Chessie System and Seaboard Coast Line Industries*, I.C.C. Finance Docket 28905 (Sub-No. 1). The petitioners argued that this merger would result in significant additional revenues to the Flora line. While we make no decision on the merits of the substantive question of whether the merger would produce increased revenues on the Flora line, we do think that this factor should now be considered. As the court stated in *Dept. of Public Service Regulation, etc., Montana v. United States*, 344 F.Supp. 1386, 1389 (1972), "evidence as to the effect of [a] merger may have significant effect upon the financial conclusions drawn by the Commission."

The B&O, of course, disputes the petitioners' arguments. In addition to arguing that

there was substantial evidence and a reasoned basis for the ICC's final order, it argues that the ICC could have authorized abandonment on the basis of the "opportunity cost" incurred by B&O in keeping the value of the rail and land in the right-of-way tied up in a deficit operation. But the ICC final decision did not rely on any "opportunity cost" argument. An agency's decision may not be upheld on a basis not articulated by the agency. *See F.P.C. v. Texaco, Inc.*, 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69, 83 S.Ct. 239, 245, 246, 9 L.Ed.2d 207 (1962); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1946).[24]

V

Petitioners' final challenge in this appeal is that, if the ICC can receive the supplementary evidence submitted by the B&O, the parties should be afforded an opportuni-

the identification of, the salient underlying considerations and type of evidence relied on .... This is not a hypertechnical requirement. It is rather the basic precondition of any intelligible administrative scheme that has as an important constituent element a provision for judicial review. If indeed it is to be the administrative decision that is reviewed, the administrators must focus the court's attention on the reasons for the decision and the court must review it on those reasons.
*United States ex rel. Checkman v. Laird*, 469 F.2d 773, 781 (2d Cir. 1972) (Leventhal, J., sitting by designation). We find that the ICC's impenetrable one-sentence "analysis" does not square with the mandate of findings and reasons.
613 F.2d at 1099–1100.

**24.** Moreover, although the B&O argues that the "opportunity cost" analysis is required by the decision in *Missouri-Pacific R.R. Co. v. United States and I.C.C.*, 625 F.2d 178 (8th Cir. 1980), the situation at bar seems, based on the facts before us, distinguishable from the situation in *Missouri-Pacific*. The opportunity cost in *Missouri-Pacific* was the railroad's inability to use elsewhere in its system 27 miles of expensive welded rail, slip op. at 1069, 1070. But the alleged opportunity cost in this case is the purported loss of about $200,000 per year in return on investment of the net salvage value of the line. B&O Br. at 32. To find such a loss would require findings that the B&O had properly

valued its assets and rate of return, and that the Flora line does not cover B&O's cost of keeping the line operating.

The first finding has not been made. Indeed, the B&O suggested to the ICC that the rail on the Flora line was not valuable and that it was old, light-weight, and had sustained many rail-surface failures. The second finding has been seriously challenged, as discussed above. Also, to accept the opportunity cost argument would ignore the law judge's finding that the B&O had *de facto* abandoned and discouraged traffic on the Flora line.

Finally, unlike the situation in *Missouri-Pacific*, this situation does not present a case of "expensive rail and other equipment," slip op. at 1070, 1071, being sacrificed at the expense of more efficient movement of other traffic by the B&O. In *Missouri-Pacific*, because the rail could be better used on other railroad lines, allowance of the opportunity cost argument was consistent with meeting the public convenience by improving the quality of other rail service. But in this case, the opportunity cost argument merely relates to increased income for the B&O, not improved equipment elsewhere in the rail system. Thus, the B&O's opportunity cost argument must be rejected as argued in this appeal. We do not decide, however, whether an opportunity cost argument, perhaps based on more fully developed facts, might prevail in possible subsequent ICC proceedings or appeals.

ty for cross-examination. The ICC responds in its brief that cross-examination is not required because the written statements submitted by the parties provided an adequate basis to resolve the facts.

■ We begin with a reluctance to interfere with an agency's freedom to fashion its own rules of procedure. *See Vermont Yankee Nuclear Power Co. v. Natural Resources Defense Council*, 435 U.S. 519, 543, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978). But although requests for cross-examination are addressed to the discretion of an agency, that discretion is not unlimited. A court may determine that "extremely compelling circumstances," *Vermont Yankee*, 435 U.S. at 543, 98 S.Ct. at 1211, exist to indicate that an agency's decision constitutes an abuse of discretion. The question before us, then, is whether the facts here rise to such extremely compelling circumstances that the ICC should have afforded the parties the opportunity for cross-examination.

■ First, while there is no across-the-board right to oral argument in every administrative proceeding, *F.C.C. v. WJR*, 337 U.S. 265, 69 S.Ct. 1097, 93 L.Ed. 1353 (1949), the general principle is that the right to be heard in adjudicative proceedings encompasses due process rights in excess of the right to submit written evidence. *Londoner v. Denver*, 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908). As the court stated in *I.C.C. v. Louisville & Nashville R.R.*, 227 U.S. 88, 93, 33 S.Ct. 185, 187, 57 L.Ed. 31 (1913):

> [T]he more liberal the practice in admitting testimony, the more imperative the obligation to present the essential rules of evidence by which rights are asserted or defended . . . . All parties must be fully apprised of the evidence submitted or to be considered, and must be given opportunity to cross-examine witnesses, to inspect documents, and to offer evidence in explanation or rebuttal. In no other way can a party maintain its rights or make its defense. In no other way can it test the sufficiency of the facts to support the findings . . . .

■ Second, the ICC concedes that the tests of whether cross-examination should be required are whether material facts are in dispute and whether the verified statements do not provide an adequate basis for the resolution of those disputed factual questions. ICC Br. at 27.[25] In this case, there is no question that material facts were in dispute. But the ICC contends that the submission of written statements by the parties provided an adequate basis to resolve those disputes. The problem with the ICC's argument, however, is that the ICC's final decision provides no inkling of how the ICC resolved the many factual disputes. Indeed, rather than resolve the challenges to the updated financial information, the ICC apparently merely adopted all of the B&O statements in toto.[26] There is no statement of reasons by the ICC in the record specifying precisely how the written supplemental information was sufficient to resolve the many factual disputes.

Third, the prior history of cross-examination in this case is very important for two reasons. First, the fact that the ICC did provide cross-examination regarding the 1974 and 1975 financial information suggests that cross-examination should not lightly be denied regarding the 1976–1978 financial information. Second, the record at the initial hearing demonstrates that the disputed facts were not subject to resolution on the basis of written verified statements. That history shows that the oppor-

---

25. In its brief, the ICC states, "[u]nder the Commission's rules, the Commission is not required to hold an oral hearing unless material facts are in dispute *and* the verified statements do not provide an adequate basis for their resolution. 49 C.F.R. § 1100.43." ICC Br. at 27 (emphasis in original). Although the parties do not dispute the standards indicated in the ICC statement (material facts in dispute; verified statements unable to resolve the disputes), the applicability of 49 C.F.R. § 1100.43 ("Rule 43") was not litigated by the parties. We make no finding regarding the applicability of Rule 43 to this case.

26. *See* note 12 *supra* and accompanying discussion.

tunity for cross-examination was critical in achieving an accurate determination of the facts.

In its abandonment application, the B&O initially claimed losses of $1,135,691 in 1974 and $1,108,856 in 1975. But after the law judge heard the evidence, in hearings in which the participants were afforded the opportunity for cross-examination, he found the B&O had earned a profit of $2,454 and had suffered a loss of $18,437 (later adjusted in the ICC final decision to a profit of $71,563) for those years, respectively. A brief review of the law judge's findings indicates over twenty references to admissions made on cross-examination.[27] Thus, the unique history of this case indicates that the B&O supplementary evidence might be less than accurate.

We emphasize the narrowness of our conclusion that the parties here should be afforded the opportunity of cross-examination with regard to the supplementary evidence received by the ICC. We do not hold that the ICC must afford cross-examination in all cases where supplemental evidence is taken after proceedings in which cross-examination was allowed. Rather, our conclusion is based on the combination of factors in this case: cross-examination was initially allowed; it played a key role in the determination of facts in the initial hearing; the agency then received supplemental evidence of the same type as that provided, and discredited after cross-examination, in the initial hearing; and the agency's final decision ignored the many serious factual disputes and gave no indication that the agency could have resolved those disputes on the basis of the written supplementary evidence submitted. These unique factors indicate that the opportunity for cross-examination, the " 'greatest legal engine ever invented

for the discovery of truth,' " *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970) *quoting* 5 Wigmore § 1367, was necessary regarding the 1976–78 financial information. Only by knowing that the parties here had the opportunity for cross-examination, can a reviewing court be assured that the ICC was relying on permissible evidence. Therefore, we find that the parties should have been afforded the right of cross-examination with regard to the supplementary evidence.

VI

For all of the foregoing reasons,[28] we vacate the final ICC decision and remand this matter to the ICC for further proceedings not inconsistent with this decision.

Vacated And Remanded.

FAIRCHILD, Chief Judge, concurring.

I concur in setting aside the ICC decision and remanding for further proceedings.

I agree with Judge Sprecher that when the Commission, on the remand it solicited, decided that its earlier decision (by Division I) could not be sustained, it was appropriate and eminently sensible to call for more current financial data. I also agree that under the circumstances it was an abuse of discretion to deny cross-examination with respect to this evidence. This was a significant denial of procedural rights and is, alone, sufficient for setting aside the decision.

If that ground were not present, I would nevertheless conclude that the decision is an inadequate demonstration that factual material was properly addressed and choices rationally made within the range of administrative discretion. I am mindful of the presumption that agency action is properly based and decided upon, but it seems to me

---

**27.** *See, e.g.:* "[o]n cross-examination, Mr. Simmons states that he did not make his inspection or judgment to conform to FRA standards ..." I.C.C. Initial Decision, No. AB–19 (Sub-No. 27) at 7; "[o]n cross-examination, Mr. Simmons testified that the B&O maintenance on this line within the past 10 to 15 years has not been very good ..." *Id.* at 8–9; "[i]n later testimony, applicant's witness also acknowledged that firemen wages were included in the figure

shown for Accounts 392 and 401." *Id.*, at App. VI, 2.

**28.** All arguments not expressly discussed in this opinion have nevertheless been duly considered. They have been found either wanting merit or insufficiently important to warrant extended discussion. Their discussion would not have altered this decision.

that the several stage history of this proceeding has pretty well eroded the presumption. I agree with Judge Sprecher that the decision left gaps, some of which are too significant to be deemed rationally filled because of a presumption of administrative propriety.

SWYGERT, Circuit Judge, dissenting.

This case is not as complex as the majority leads one to believe. The Baltimore and Ohio Railroad wishes to abandon a 100-mile section of its track in central Illinois. It proved that the operation of this line has been unprofitable in the past and that its future prospects are no brighter. The Interstate Commerce Commission considered evidence of five years' operations of the line and, after balancing the losses to the railroad with the hardship to the public were the section to be closed, decided that the public interest was best served by allowing the railroad to abandon the line. In view of the substantial evidence before the Commission and the deference to be accorded its decisions, we should uphold the order and permit the abandonment.[1]

The majority finds fault in four concerns—regarding maintenance expenses, the weight attached to the losses in 1976–1978, alternate transportation and future prospects—that led the Commission to approve the abandonment. In each instance, the majority's complaint is essentially that the Commission does not explain its decision as fully as the court would like. Our task, however, is not to require that agencies always write lengthy opinions which explain every finding or rebut every argument made by the losing side. Particularly in a case such as this in which the final determination involves a balancing of interests, our purpose should be to ensure that the findings—and the ultimate conclusion—are justified by a sufficient basis in the record. There can be little doubt that in this case the Commission had before it more than enough evidence to support the result.

The Commission found that the railroad suffered significant losses, ranging from $32,695 to $492,279, from 1976–1978. The contestants and the majority do not dispute this bottom-line figure; nor do they contend that no maintenance costs were properly includable in that figure. Rather, they argue simply that the Commission did not explain fully enough its finding that the maintenance expenses were "reasonable." *See* majority opinion, *supra* at pp. 1076–1077. The Commission stated in its opinion:

B&O's expenses to maintain the line are reasonable. The record indicates that from 1974 through 1978 B&O had maintenance expenses on a per-mile basis ranging between $1,753 (1974) and $5,763 (1977) and averaging $3,583 over the 5-year period. These are reasonable expenses for operations at FRA class I safety standards. Considering the railroad operates the branch line at FRA class III safety standards, we find these maintenance costs are reasonable.

360 ICC 681, 682 (1980). I cannot understand why that is not a sufficient explanation. The majority declares that it is too conclusory simply because the Commission does not respond to petitioners' argument that the costs were the result of the railroad's failure to perform adequate maintenance in the past. It is not the Commission's responsibility to counter every argument put forward by the parties in each case,[2] particularly where, as here, there is more than adequate support for the finding in the record. The majority ignores the testimony of petitioner Illinois Department of Transportation's own expert witness and that of two other witnesses that maintenance expenses of $666,416 per year would be a reasonable figure. The railroad's actual spending never even approached that fig-

---

1. I agree with the majority's holding in part II of its opinion that the Commission had the authority to consider the supplementary evidence on the remand, although I dispute their statements that this evidence is not to be ac-

corded the same weight as the original evidence. *See* discussion, *infra,* at pp. 1085–1086.

2. *See* discussion, *infra,* at pp. 1086–1087.

ure.[3] We are not relying on grounds not articulated by the Commission[4] when we search the record to see whether the Commission had before it sufficient documentary or testamentary evidence to support its conclusion. *See Colorado Interstate Gas Co. v. FPC*, 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945). Where such evidence exists, as it does here, we should not so readily reject the Commission's conclusion.[5]

The majority questions the weight that was accorded this supplemental financial evidence that was received upon remand.[6] Operations for the years 1976–1978 took place only after the railroad had filed its application for abandonment. Because operations during that time were conducted with the knowledge that the line might be abandoned, the majority reasons, the financial evidence is not representative of the potential profitability of the line and therefore should not be accorded as much weight as the evidence from the two years preceding the filing of the application. The same problems exist, however, for those two earlier years. Certainly during that time, the railroad knew that abandonment was a pos-

sibility, and any tendency towards reducing service could appear as much during those two years as they would after the filing of the application.[7] Indeed, the fact that the railroad spent significantly more on maintenance during the *post-application* years indicates that it may have been making an attempt to salvage the line.[8] The relative reliability of evidence, moreover, is for the Commission, not for us, to decide. As the Supreme Court noted in *New York v. United States*, 331 U.S. 284, 328, 67 S.Ct. 1207, 1230, 91 L.Ed. 1492 (1947), "[O]n a subject of transportation economics, ... the Commission's judgment is entitled to great weight. The appraisal of costs figures is itself a task for experts."

The majority also questions the sufficiency of the Commission's findings with respect to alternate transportation and future prospects. Again the record before the Commission contains more than adequate evidence to support its conclusion. Sufficient alternate transportation exists for the shippers on the line. Of the 19 stations located on the line, seven (accounting for 65 percent of the carloads on the line) are

---

3. These costs amounted to $400,355 in 1976; $595,262 in 1977; and $442,622 in 1978.

4. *See SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *FPC v. Texaco, Inc.*, 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974).

5. The majority's discussion of "normalized" maintenance expenses, *supra* at 1076–1077, is irrelevant to the decision in this case, since the Commission based its decision on the *actual* expenses incurred which were a component of the losses from 1976–1978.

6. The Commission stated:
 The proposed abandonment will significantly reduce the drain on B&O's net operating income. Considering the updated financial information, the record indicates that in 1976, 1977, and 1978, B&O would have net operating losses of $32,695, $492,279, and $276,374, respectively. Despite the net profit, excluding rehabilitation costs, of $71,563 for 1975, these figures substantiate the bleak financial picture forecast for B&O operations in division I's prior decision. In addition, the evidence indicates that to break even for 1976, 1977, and 1978, B&O had to handle 3,886 cars, 4,670 cars, and 3,622 cars, respec-

tively. During those years, however, B&O handled only 3,610 cars, 2,725 cars, and 2,504 cars, respectively, bearing out our prior finding that future traffic predictions are speculative. We find that during the last 3 years, the line under consideration did not generate sufficient traffic to justify further operations. 360 ICC at 683.

7. The majority misstates the Commission's argument concerning the regulation, 49 C.F.R. § 1121.20(b)(1), which requires a railroad to identify a line as a potential candidate for abandonment sometime between four months to three years prior to the filing of an abandonment application. *See* majority opinion, *supra* at 1077, 1078. The regulation does not affect representativeness of the evidence at all, for it is irrelevant when within that time period notice is first given. The simple fact is that an abandonment decision will not be made quickly, and that any evidence will suffer some problems of nonrepresentativeness. That is exactly why we have the Commission to weigh such evidence.

8. Compared with the higher maintenance expenses cited *supra* in n.3, those costs were only $181,028 in 1974 and $230,795 in 1975.

served directly by other rail carriers, and all are within 13 highway miles of an alternate rail station.[9] Team track facilities for loading and unloading between trucks and rail cars are also located within 14 miles of almost all the stations. Furthermore, many motor carriers serve the area already. The record also indicates the small number of shippers in most of the towns served and that, where any major inconvenience would be caused the railroad has offered to make alternate arrangements for the convenience of the shippers.[10] This same evidence supports the Commission's finding that future prospects for the line are bleak. The line serves only two towns of larger than 2000

people,[11] and there is little reason to believe that its use could grow in the future.

The majority's only argument concerning this evidence is that the contestants raised a number of issues which the Commission did not address specifically in its opinion. This seems to me to place too large a burden on an agency. Where the Commission, as here, explains the reasons for its action, and where there is sufficient evidence in the record to support those reasons, no more should be necessary. The Commission should not have to respond to all the contentions normally raised in a shotgun approach under such circumstances.[12] The

9. The small size of the 19 stations and the easy availability of alternate transportation are indicated by the chart below:

| Station | Population | Other Railroads Serving Station | Nearest Alternate Railroad | |
|---|---|---|---|---|
| | | | Railroad | Highway Miles |
| Rochester | 1,667 | — | ICG | 7 |
| Berry | 64 | — | ICG | 11 |
| Breckenridge | 47 | — | ICG | 13 |
| Edinburg | 1,153 | — | N&W | 9 |
| Sharpsburg | 78 | — | N&W | 5 |
| Taylorville | 10,644 | N&W, C&IM | N&W, C&IM | 0 |
| Owaneco | 278 | — | N&W | 8 |
| Millersville | 61 | — | CR | 6 |
| Pana | 6,326 | CR, ICG, C&EI | CR, ICG, C&EI | 0 |
| Tower Hill | 683 | CR | CR | 0 |
| Lakewood | 175 | — | N&W | 6 |
| Cowden | 537 | N&W | N&W | 0 |
| Beecher City | 466 | — | C&EI | 3 |
| Moccasin | 75 | C&EI | C&EI | 0 |
| Altamont | 1,929 | CR, C&EI | CR, C&EI | 0 |
| Gilmore | 25 | — | CR | 6 |
| Edgewood | 495 | ICG | ICG | 0 |
| Iola | 163 | — | ICG | 7 |
| Louis | 1,020 | — | B&O | 8 |

Abbreviation code

N&W — Norfolk and Western
C&EI — Chicago & Eastern Illinois Railroad Company
C&IM — Chicago & Illinois Midland Railroad Company
ICG — Illinois Central Gulf Railroad Company
CR — Conrail

10. The railroad has offered to donate its tracks for $1.00 at Cowden, Altamont and Taylorville, for example, so that shippers there will receive direct rail service from the Norfolk and Western, Conrail, and the Chicago and Illinois Midland. For a complete documentation of the affected shippers and the minimal impact that an abandonment would have upon them, see

Intervenor B&O Railroad Co.'s brief at pp. 7–15.

11. See n.9, supra.

12. Nor in a case like this should the Commission even be required to rebut every contrary finding by the Administrative Law Judge. Credibility is not at issue in this case. The

Supreme Court has held that the Commission is not required to make subordinate findings on every collateral contention of the parties. *See Minneapolis & St. Louis R.R. v. United States*, 361 U.S. 173, 193, 80 S.Ct. 229, 241, 4 L.Ed.2d 223 (1959).[13] That is particularly true in cases like this where the ultimate decision involves a balancing of competing interests.[14] The Supreme Court has even stated that in such cases, no specific findings of fact are necessary. *Colorado v. United States*, 271 U.S. 153, 169, 46 S.Ct. 452, 456, 70 L.Ed. 878 (1926). The Commission *has* presented a reasoned decision that fairly addresses the issues in this case.[15] Its reasons for the decision are clear, and they are amply supported by the record. It has articulated a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). The mere fact that the Commission did not counter every argument raised by the contestants is not a sufficient ground to reverse its decision. The Commission's authority in determining issues of public convenience and necessity is broad, and the scope of judicial review is correspondingly narrow. *Bowman Transportation, Inc. v. Arkansas-Best Freight System*, 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). "He who would upset the . . . order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." *ICC v. Jersey City*, 322 U.S. 503, 512, 64 S.Ct. 1129, 1133, 88 L.Ed. 1420 (1950). The

appellants in this case have not met that burden.

I would affirm the order of the Commission.[16]

---

same evidence, in essentially the same form, was before the full Commission as was before the ALJ. *See Bangor & Aroostook R.R. v. ICC*, 574 F.2d 1096, 1110 (1st Cir. 1978).

**13.** After five years of consideration, I do not understand how the majority can imply that the Commission's actions were summary.

**14.** The Commission's final judgment was just such a weighing:

Considering the additional financial information, we have weighed the convenience to the shippers from not having to incur higher costs of alternative transportation against the limited amount of traffic handled by B&O in the past and the speculative nature of

future traffic and B&O's loss from operating the line, see *Colorado v. United States*, 271 U.S. 153, 168, 46 S.Ct. 452, 455, 70 L.Ed. 878 (1926). We conclude that the burden on interstate commerce outweighs any inconvenience to the shippers and, therefore, we affirm division I's grant of the abandonment. 360 ICC at 683.

**15.** *See* majority opinion, *supra* at 1079, 1080.

**16.** I also disagree with the majority's conclusion that cross-examination of the supplementary evidence was required in this case. The contestants had ample opportunity to rebut any evidence they found faulty.