**BALTIMORE AND OHIO RAILROAD COMPANY, et al., Petitioners**

**v.**

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**Pennsylvania Electric Company, et al., Intervenors.**

**No. 86–1474.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 1, 1987.

Decided Aug. 25, 1987.

Lawrence H. Richmond, Washington, D.C., with whom Peter J. Shudtz, Baltimore, Md., was on the brief, for petitioners.

Richard J. Osterman, Jr., Atty., I.C.C., with whom Robert S. Burk, Gen. Counsel and Ellen D. Hanson, Associate Gen. Counsel, I.C.C., were on the brief, and John J. Powers III and Donald S. Clark, Attys., Dept. of Justice, Washington, D.C., for respondents.

McNeill Watkins II, Washington, D.C., was on the brief, for intervenors.

Before EDWARDS and SILBERMAN, Circuit Judges, and PARKER,* Senior Judge, United States District Court for the District of Columbia.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

The Baltimore and Ohio Railroad Company ("B & O") petitions for review of a decision by the Interstate Commerce Commission ("ICC" or "Commission") denying its application to abandon approximately seven miles of railroad line. B & O contends the Commission's determination that "public convenience and necessity" require B & O's continued operation of the line was arbitrary and capricious. The ICC, it is argued, ignored the possibility that shippers might ensure continued railroad ser-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

vice by purchasing the line or subsidizing its continued operation. Because we believe the Commission's stated reason for refusing to consider this possibility—that it is prohibited by law from doing so—reflects an unreasonable interpretation of the Interstate Commerce Act, 49 U.S.C. § 10101 et seq. (1982), we vacate the ICC's decision and remand the case for further proceedings.

## I.

The B & O trackage at the center of this dispute, the "Indiana Subdivision," is a 7.19–mile branch line in western Pennsylvania. This line serves only two shippers. One of these is the Homer City Electric Generating Station, a coal-fired power plant that supplies electricity to customers in Pennsylvania and New York. It is jointly owned by Pennsylvania Electric Company and New York State Electric and Gas Corporation (hereinafter jointly referred to as "Penelec"). The plant is a "mine-mouth" facility, which means it is designed to use coal mined at the plant site. Although it does use some off-site coal, none of that coal is currently shipped by rail; indeed, the plant does not contemplate using rail-shipped coal until 1992 at the earliest. Homer City Station's only present need for the Indiana Subdivision is to ship, on occasion, heavy generating equipment to other locations for repair. The second shipper on the Indiana Subdivision is a coal-cleaning test facility owned by the Electric Power Research Institute ("EPRI"). This facility receives coal samples by both truck and rail for testing.

The Indiana Subdivision has been put to only minimal use recently; during the two and one-half years covered in the record (1983 through mid–1985), the track accommodated approximately ten carloads per year. These shipments produced no more than $20,000 annual revenue. Yet the "opportunity cost"[1] to B & O of keeping the track available is approximately $60,000 per year. The railroad also incurs the regular cost of maintaining the track and pro-

viding service to the two shippers. The line has accordingly been an economic burden on B & O, and the prospects for increased revenues—let alone profitability—are uncertain at best.

In light of this bleak financial outlook, B & O applied to the Commission in December, 1985 for permission to abandon the Indiana Subdivision. The Interstate Commerce Act requires ICC approval of all railroad abandonments, see 49 U.S.C. § 10903 (1982), and the Commission must determine that "present or future public convenience and necessity require or permit the abandonment." Id. In making this determination, the Commission must balance "the interests of those now served by the present line on the one hand, and the interests of the carrier and the transportation system on the other." Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 321, 101 S.Ct. 1124, 1132, 67 L.Ed.2d 258 (1981) (quoting Purcell v. United States, 315 U.S. 381, 384, 62 S.Ct. 709, 711, 86 L.Ed. 910 (1942)). Once the Commission approves an abandonment, any "financially responsible person" may offer to provide "financial assistance" to the carrier by subsidizing continued operation of the line or purchasing it. See 49 U.S.C. § 10905 (1982). If the railroad and the offeror enter into an agreement, the Commission shall postpone abandonment of the line so long as the agreement is in effect. Id. § 10905(e). If the railroad and offeror fail to agree on the terms of purchase or subsidy, either party may request that the Commission impose terms. Id.

Penelec and EPRI, the two shippers located on the Indiana Subdivision, both objected to B & O's abandonment proposal on grounds that it would inflict an excessive economic hardship on them. Penelec claimed that shipment over the Indiana Subdivision is the only practical way it can transport damaged generating equipment to the manufacturer for repair. The equipment's size and weight is such that the only other manner of transporting it to the main rail line (for shipment onward to the

---

**1.** "Opportunity cost" is defined by the Commission as the economic loss experienced by the

railroad from foregoing a more profitable alternative use of its assets.

manufacturer) would be by "heavy-hauler" motor carrier. Penelec asserted that it would cost $165,000 to transport a unit of generating equipment by this method, that such a move would take forty-eight days longer than an all-rail move direct from the plant, and that for every extra day the equipment is away from the plant the utility would incur at least $232,000 of replacement energy costs. In sum, Penelec argued, if the Commission granted abandonment, the utility would be forced over time to incur millions of dollars in added expenses. The second shipper, EPRI, objected to rail abandonment on grounds that obtaining coal samples solely by truck would be prohibitively expensive and might ultimately force the facility to shut down.

In response, B & O argued that the prospective difficulties envisioned by the shippers were quite artificial. Under section 10905, if the Commission had approved the abandonment application, the shippers could have purchased the Indiana Subdivision from the railroad for its net liquidation value of $321,972.[2] Buying the line (or subsidizing its continued operation) would, of course, guarantee Penelec and EPRI continued railroad service, and preclude the need to pay for more costly alternative means of transportation. The real effect of a Commission approval of abandonment, according to B & O, would be to free the railroad from subsidizing its shippers, thereby forcing them to pay the true cost of their railroad service.

The ICC, however, agreed with the shippers and denied B & O's application, holding that "the severe impact of loss of rail service upon shippers outweighs the rather small economic burden ... of continued operations upon" B & O. *See Buffalo, R. & P. Ry. Co. & Baltimore & O. R.R. Co.—Abandonment and Discontinuance of Serv. in Indiana County, PA* (not printed), served June 26, 1986 ("B & O"). In a 3–2 decision, the Commission refused to consider the possibility that Penelec would

exercise its right to purchase or subsidize the line, believing that contingency "not a proper matter for consideration in an abandonment proceeding." *B & O* at 9. The Commission determined that Congress' 1976 addition of financial assistance provisions to the Interstate Commerce Act, *see* Railroad Revitalization and Regulatory Reform Act of 1976 ("4R Act"), Pub.L. No. 94–210, §§ 802, 809(c), 90 Stat. 127, 130, 146 (1976) (codified at former § 1a(6),[3] precluded it from considering potential financial help: "[T]he entire statutory scheme for abandonments and offers of financial assistance would be subverted if the possibility of purchase or subsidy of the line were to be given consideration, either positive or negative, in the abandonment proceeding." *B & O* at 9. The ICC cited its prior opinion, *Illinois Cent. Gulf R.R. Co. —Abandonment—In McLean, Woodford, Marshall, LaSalle, Lee, Ogle & Stephenson Counties, IL* (not printed), served Sept. 15, 1983 ("ICG") in support of this interpretation. Two Commissioners dissented, arguing that the possible continuation of rail service following abandonment—pursuant to section 10905 procedures—was a proper factor to be considered in the abandonment decision.

B & O sought to reopen the proceedings, contending that the ICC had erred in refusing to consider the purchase/subsidy alternative. The Commission denied B & O's petition, *see Buffalo, R. & P. Ry. Co. & Baltimore & O. R.R. Co.—Abandonment and Discontinuance of Serv. in Indiana County, PA* (not printed), served Aug. 29, 1986, and reaffirmed its view that the Interstate Commerce Act precludes consideration of financial assistance at the abandonment stage. Bolstering its rationale, the Commission explained that "[b]ecause it is uncertain whether *bona fide* financial assistance offers actually will be filed, consideration of the possibility of such offers at the decisional stage would only add an element of uncertainty to the process." *Id.*

---

**2.** Because Penelec had already taken initial steps to purchase the Indiana Subdivision, B & O's argument assumed that Penelec would be the likely source of financial assistance.

**3.** Congress revised the financial assistance provisions of section 1a(6) in 1980, and that section was recodified to become 49 U.S.C. § 10905. *See* Staggers Rail Act of 1980, Pub.L. No. 96–448 § 402(c), 94 Stat. 1943–1945 (1980).

at 2. B & O now petitions for review of these decisions.

## II.

This is a strange case. After Congress, in 1976, created financial assistance provisions guaranteeing any financially responsible person—including shippers and even state governments—the right to purchase or subsidize abandoned railroad facilities, the Commission promulgated a regulation stating that the Commission would *not* consider an offer of financial assistance "in making its initial finding on the merits of abandonment." 49 C.F.R. § 1121.38(h)(3) (1977). It is not entirely clear that the regulation precluded the Commission from considering the *prospect* of a subsequent purchase as opposed to a specific offer in an abandonment proceeding; but in any event, in 1983 the Commission inexplicably revoked the regulation. *See* 48 Fed.Reg. 27,269, 55,128 (1983). Now, faced with a case in which a railroad asserts that the Commission should consider the possibility of a purchase—at least for the limited purpose of measuring the prospective harm to the only two users of the track sought to be abandoned—the Commission claims that the statute itself precludes that approach. The Commission, then, is in the relatively unusual position of asserting in the Court of Appeals a more restricted view of its statutory authority than that advanced by petitioners.

Our difficulty is that we cannot find in the statute or its legislative history any support for the Commission's restrictive construction and therefore do not believe it is a reasonable interpretation. *See Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Section 10903, as the Commission concedes, carries no intimation that the Commission is precluded from considering the possibility of financial

assistance. In traditionally broad delegation language, section 10903 merely requires that the ICC consider "public convenience and necessity." [4] Nor does the fact that section 10905 comes into play only after the Commission makes its abandonment decision imply that the Commission may not consider the cost (or convenience) of purchasing the track when calculating the inconvenience of an abandonment to a shipper. Section 10905 confers a *right* to purchase abandoned track. Necessarily then, the financial assistance provisions can only be invoked by a prospective purchaser after the Commission makes its abandonment decision. But that hardly, it seems to us, precludes the Commission from considering the prospective cost of the facilities to a shipper as an offset to the shippers' alleged prospective economic harm.

Nothing in the legislative history of the 4R Act, moreover, suggests a congressional intent so to restrict the Commission's abandonment decision. Prior to 1976, when post-abandonment sale of railway lines was left entirely to the discretion of the railroads and shippers, ICC decisions permitting abandonment frequently took into account the fact that shippers could mitigate the effects of railway abandonment by purchasing the line. *See, e.g., Virginia & S.W. Ry. Co., et al.—Abandonment,* 247 ICC 639, 649 (1941); *Rock Island & D. Ry. Co., et al.—Trustees Abandonment,* 221 ICC 794, 800 (1937). On at least one occasion, the Commission granted an abandonment request in part *because* the railroad had offered to sell the line proposed for abandonment to the shipper. *See New York, N.H. & H. R.R. Co., et al.—Trustees Abandonment,* 228 ICC 4, 23 (1938) (*"New York"*). The 4R Act of 1976, as we noted, guaranteed shippers the right to purchase or subsidize any railway line approved for abandonment. Although the Act's legislative history makes the obvious

---

**4.** The relevant part of section 10903 provides:
A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission ... may—
    (1) abandon any part of its railroad lines; or
    (2) discontinue the operation of all rail transportation over any part of its railroad lines;

only if the Commission finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance. In making the finding, the Commission shall consider whether the abandonment or discontinuance will have a serious, adverse impact on rural and community development.
49 U.S.C. § 10903(a) (1982).

point that this opportunity would arise only after the ICC had decided to permit abandonment, *see* S.CONF.REP. NO. 595, 94th Cong., 2d Sess. 142 (1976), the President understood that the 4R Act would not change in any way the substantive standard for granting abandonments, *see* President's Message to Congress Transmitting a Draft of the Railroad Revitalization Act, H.R.DOC. No. 155, 94th Cong., 1st Sess. 29 (1975); Congress did not object to that interpretation. *See* S.REP. NO. 499, 94th Cong., 1st Sess. 106–07 (1975). The pre-1976 regime, under which the possibility of shippers' buying abandoned lines was considered an appropriate factor in the Commission's abandonment decision, was, as far as we can determine, not at all affected by Congress' passage of the 4R Act. Thus, the ICC plainly erred in inferring that Congress intended to narrow the "public convenience and necessity" inquiry. *Cf. ICC v. Railway Labor Executives Ass'n*, 315 U.S. 373, 376–79, 62 S.Ct. 717, 719–21, 86 L.Ed. 904 (1942) (ICC may not lightly infer congressional intent to circumscribe the Commission's assessment of public necessity and convenience from its amendment of other sections of Interstate Commerce Act).

The ICC also relied on its *ICG* decision, *see supra* at 6, as support for its interpretation of the Act, but the Commission over-reads its own decision. *ICG* simply held that the fact that someone offers to purchase a line during an abandonment proceeding cannot be used to indicate that the line is actually profitable and therefore undeserving of abandonment. Any contrary rule, the Commission said, would subvert the entire statutory scheme because such offers would automatically defeat the abandonment application that gave rise to them. *Id.* at 3. This perfectly reasonable opinion cannot be stretched to encompass the Commission's current interpretation that prospects of financial assistance may not be considered *for any purpose* in the abandonment decision.

It may well be—we do not decide—that the Commission is free to reinstate its 1977 regulation or to, in an adjudicatory fashion, elaborate the policy that appeared to be embodied in that regulation. Indeed, there may be practical considerations apparent to the Commission, drawing upon its expertise, that support that policy. We certainly recognize that Congress' delegation to the agency to identify those factors that are properly encompassed within the phrase "public convenience and necessity" is broad indeed. We hold only that the Commission must explicitly assume the policy-making function that Congress delegated to it rather than assert a nonexistent congressional prohibition as a means to avoid responsibility for its own policy choice.[5]

*So ordered.*

---

**5.** B & O also argues that the Commission failed to explain its "deviation" from a long-standing policy against requiring operation of uneconomic railway lines when the shippers' need for those lines is speculative or occasional. B & O cites the ICC's 1938 *New York* decision as establishing that policy and argues that the Commission simply brushed aside that decision without adequately explaining why the policy articulated there does not apply here. Our remand of this case makes it unnecessary to resolve this issue.