**SOUTHERN PACIFIC TRANSPORTA-TION COMPANY, Petitioner,**

v.

**INTERSTATE COMMERCE COMMIS-SION; United States of America, Respondents,**

**County of El Dorado, Respondent–Intervenor.**

**No. 88–7009.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 10, 1989.

Decided March 29, 1989.

Gary A. Laakso, San Francisco, Cal., for petitioner.

Louis Mackall, I.C.C., Washington, D.C., for respondents.

Charles H. Montange, Washington, D.C., for respondent-intervenor.

Before BROWNING, BEEZER and KOZINSKI, Circuit Judges.

JAMES R. BROWNING, Circuit Judge:

The Interstate Commerce Commission rejected Southern Pacific's application to abandon its 38.573-mile Placerville Branch serving El Dorado County, California, near Lake Tahoe, essentially on the ground that abandonment would be premature. Southern Pacific petitions for review pursuant to 28 U.S.C. §§ 2321(a) and 2342(5). We deny the petition.

## I.

Southern Pacific claimed that present and estimated future traffic levels did not justify continued operation of the Placerville Branch. The railroad reported that a steady decline in the lumber industry and the loss of traffic from two major business concerns had resulted in a decline in traffic from 2,500 carloads in 1975 to 548 a decade later and to only 64 in the first six months of 1987.

Southern Pacific acknowledged that despite the traffic decline the Placerville Branch continuously earned a net profit, totaling $165,616 in 1984, $231,240 in 1985 and $184,019 in the base year of July 1986 through June 1987.[1] However, the carrier projected a continuation of the traffic decline and an increase in the cost of necessary repair and maintenance, and predicted a one-year operating loss of $121,735, which abandonment would avoid. Southern Pacific also claimed abandonment would save the railroad an annual opportunity cost of more than $1.442 million.[2]

El Dorado County vigorously disputed Southern Pacific's estimated operating loss and opportunity costs. The County projected increases in traffic more than sufficient to generate a profit even after accounting for future repair and maintenance costs. These estimates were supported by affidavits from executives of two new companies, which had supplanted the two shippers lost to Southern Pacific, pledging future shipments exceeding those of the businesses they replaced; and by forecasts from lumber company officials that use of the Branch would increase substantially because of the anticipated economic recovery of that industry. The County offered evi-

1. A "base year" is the latest 12-month period, ending no earlier than six months prior to the filing of the abandonment application, for which the railroad has pertinent data. 49 C.F.R. § 1152.2(c).

2. "Opportunity cost" represents the economic loss sustained by the railroad from foregoing a more profitable alternative use of its assets. *See Busboom Grain Co. v. ICC,* 830 F.2d 74, 74–75 (7th Cir.1987); *Baltimore & Ohio R.R. Co. v. ICC,* 826 F.2d 1125, 1126 n. 1 (D.C.Cir.1987). Southern Pacific calculated it could realize $6,787,275 by selling the land under the tracks and $968,837 by salvaging portions of the line. This net liquidation value of $7,756,112, multiplied by an 18.6% rate of return, resulted in an annual opportunity cost of $1,442,637.

dence that Southern Pacific's opportunity costs were premised upon greatly inflated land appraisals, and that the true costs were closer to $144,000 annually, or one-tenth Southern Pacific's figure. Most importantly, the County offered evidence that abandonment would devastate the local economy and frustrate future planned development because alternative means of transporting freight into and out of El Dorado were not economically feasible.

The ICC denied Southern Pacific's application. The Commission noted it was required to balance the interests of those served by the line against the interests of Southern Pacific and the transportation system, and could grant the application only if Southern Pacific proved that present or future convenience or necessity permitted abandonment. *Southern Pacific Transp. Co.—Abandonment—in El Dorado and Sacramento Counties*, No. AB–12, served Aug. 10, 1987, at 7 (SP I) (citing 49 U.S.C. § 10903); *see Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 321, 101 S.Ct. 1124, 1132, 67 L.Ed.2d 258 (1981); *Railway Labor Executives' Ass'n v. ICC*, 825 F.2d 238, 239 (9th Cir.1987). The ICC concluded Southern Pacific had failed to carry its burden of proving abandonment of the Placerville Branch at this time would serve the public convenience or necessity. *SP I, supra*, at 7; *see* 49 U.S.C. § 10904(d)(1); *Simmons v. United States*, 698 F.2d 888, 893 (7th Cir.1983).

The ICC emphasized that Southern Pacific's own "revenue and cost data indicate operation of the line has produced substantial profits and would remain profitable even if [the railroad] performed the short-term maintenance it says is necessary to keep the line at its present condition." *SP I, supra*, at 7. The Commission accorded less weight to Southern Pacific's projected long-term repair costs because they were "speculative." *Id.* The Commission also gave limited effect to the loss of the two major shippers on the ground the railroad's evidence was not sufficient to discount the County's showing that these operations had been acquired recently by new owners who anticipated substantial use of the railroad.

The Commission noted that the abandonment would have a significant impact on El Dorado County shippers and the community generally; that the County had raised legitimate concerns about the effects of loss of rail service to the area; and that the railroad had failed to substantiate its assertions that alternative means of transportation were economically feasible.

The Commission did not resolve the dispute over the level of opportunity costs, because it concluded that "[e]ven accepting the [railroad's] figures, those costs would not constitute a reason to grant the abandonment." *Id.* at 8. In reaching this conclusion, the ICC pointed out that opportunity costs were not dispositive, and that in this case "the documented profitability of the line, the lack of any showing that alternative transportation services are economically feasible, and the adverse impact of the abandonment on shipper and community interests weigh against a grant of the abandonment application." Considering all relevant factors, the ICC concluded that, "[o]n balance, the public convenience and necessity do not support abandonment." *Id.*

Southern Pacific filed an administrative appeal, which the ICC rejected. *Southern Pacific Transp. Co.—Abandonment—in El Dorado and Sacramento Counties*, No. AB–12 (Sub-No. 113), served Nov. 12, 1987, at 4 (*SP II*). The Commission adhered to its conclusion that Southern Pacific had not provided adequate data reflecting current operations. It gave no weight to Southern Pacific's projected losses on the Placerville Branch because the railroad's claim that operating costs would increase was based on a steady or accelerated flow of traffic while its assertions that revenues would decrease was premised on a significant decline in use. *Id.* at 2. The ICC also rejected the railroad's contention that the Commission erred by not calculating the exact level of opportunity costs:

We found that, under either the [Southern Pacific] or County methodology, [Southern Pacific] would incur a substantial opportunity cost.... [But] other

factors, including the profitability of the line, lack of feasible alternative transportation service, and adverse impact on the community outweighed the opportunity cost to [the railroad]. Weighing the burdens of continued rail service on the carrier against the burden of the abandonment on the affected shippers and community is the means used to determine whether to permit abandonment. *Colorado v. United States*, 271 U.S. 153 [, 46 S.Ct. 452, 70 L.Ed. 878] (1925). [The railroad] has not convinced us that we erred in balancing those burdens in this case.

*Id.* at 3.[3]

The ICC concluded, in essence, that Southern Pacific's application was premature because it was clear abandonment would adversely affect El Dorado County, but it was unclear that continued operation would burden Southern Pacific or the railroad system. "[T]he shippers are serious in their efforts to increase traffic," the ICC noted, and "since [the railroad] has not established that current operations are unprofitable, the shippers have the opportunity to increase traffic to anticipated levels. On the other hand, if projections [of future use] do not materialize, [Southern Pacific] may again seek abandonment." *Id.* at 4.

The railroad petitioned for review.

## II.

Congress has endowed the Interstate Commerce Commission "with broad power to regulate a carrier's permanent or temporary cessation of service"; the Commission's jurisdiction over abandonments is "exclusive" and "plenary." *Chicago & N.W. Transp. Co.*, 450 U.S. at 319, 320, 101 S.Ct. at 1131. Our function in reviewing the Commission's determination whether to permit abandonment is accordingly narrow:

In deciding whether to permit an abandonment, the Commission must balance "the interests of those now served by the present line on the one hand, and the interests of the carrier and the transpor-

tation system on the other." *Purcell v. United States*, 315 U.S. 381, 384, 62 S.Ct. 709, 710, 86 L.Ed. 910 (1942). Once the Commission has struck that balance, its conclusion is entitled to considerable deference. "The weight to be given to cost of a relocated line as against the adverse effects upon those served by the abandoned line is a matter which the experience of the Commission qualifies it to decide. And, under the statute, it is not a matter for judicial redecision." *Id.* at 385, 62 S.Ct. at 711.

The breadth of the Commission's statutory discretion suggests a congressional intent to limit judicial interference with the agency's work.

*Id.* 450 U.S. at 321, 101 S.Ct. at 1132.

We have no authority to reweigh the evidence underlying the Commission's decision. *Ralston Purina Co. v. Louisville & Nashville R.R. Co.*, 426 U.S. 476, 477–78, 96 S.Ct. 2160, 2161, 48 L.Ed.2d 781 (1976) (per curiam). We review its conclusions only to ensure they are not arbitrary or capricious, an abuse of discretion, contrary to law or unsupported by substantial evidence. *Gray Lines Tour Co. v. ICC*, 824 F.2d 811, 813 (9th Cir.1987). An ICC decision is neither arbitrary nor capricious if the Commission weighed the relevant factors and stated a rational basis for the balance it struck. *Bowman Transp. Inc. v. Arkansas Best Freight Sys.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); *Railway Labor Executives*, 825 F.2d at 239–41.

## III.

█ Southern Pacific claims the ICC "ignored" Southern Pacific's evidence of a decline in traffic and increase in operating costs that together would create future losses. As our summary of the Commission's decision demonstrates,[4] the ICC considered these factors in detail and stated clearly why the Commission concluded they did not justify abandonment at this time.

---

3. Other arguments rejected by ICC in its second decision will be discussed below.

4. *See supra* at 840.

The ICC predicted that shipments from two new companies, combined with increased traffic from the local lumber industry as it emerged from a cyclical decline, would more than offset the loss of traffic from the two major shippers the new companies replaced.[5] Such predictive judgments, when based upon credible evidence, are best left to the expertise of the administrative agency familiar with the industry. *FCC v. National Citizens Comm'n for Broadcasting,* 436 U.S. 775, 814, 98 S.Ct. 2096, 2121, 56 L.Ed.2d 697 (1978).

The Commission acted within its discretion in concluding this evidence was not undercut by the failure of the predicted traffic to materialize during the course of the abandonment proceedings, in view of the County's showing that Southern Pacific downgraded service on the Placerville Branch after filing the application to abandon. *SP II, supra,* at 3; *see Illinois v. United States,* 666 F.2d 1066, 1078–80 (7th Cir.1981). According to the County's evidence, Southern Pacific adopted an "adversarial attitude toward the line" by severely delaying pick ups, cutting service in half and imposing a $750–per carload surcharge.[6] The president of one company labelled Southern Pacific's actions "tantamount to a de facto embargo, suspension, and abandonment of service on this line without the approval or authorization of the Interstate Commerce Commission.... Shippers are literally being driven off this Branch by the railroad."

The Commission found Southern Pacific's evidence insufficient to establish future operating costs would render the line unprofitable. The railroad's own "revenue and cost data indicate operation of the line has produced substantial profits and would remain profitable even if applicant performed the short-term maintenance it says is necessary to keep the line at its present condition." *SP I, supra,* at 7.[7] Moreover, the Commission noted, Southern Pacific's short term cost-revenue projections, forecasting future losses, were flawed by discrepancies.[8] The Commission also declined to base its decision on Southern Pacific's projection of long term losses—the railroad conceded that most of the $3.237 million in projected long term track repair need not be undertaken in the next two-to-three years, and the ICC refused to speculate as to whether the level of traffic at that time would produce revenues sufficient to cover the added expense.

The Commission concluded it was too soon to tell with sufficient certainty whether the line would become a burden on Southern Pacific or would remain profitable, and invited Southern Pacific to reapply for abandonment if the promised increase in traffic did not materialize. *SP II, supra,* at 4. We do not believe the ICC's pragmatic approach was arbitrary or capricious. A cautious approach was justified under the circumstances. A grant of abandonment under section 10903 is normally irrevocable. If abandonment were approved, the Commission would be powerless, absent extraordinary circumstances, to order rail service reinstated even if the need forecast by the County and its shippers proved

---

5.  Two new companies, P.W. Pipe and Cornett, together promised shipments exceeding those of the businesses they replaced. P.W. Pipe's president anticipated shipping in at least 250 carloads annually of raw materials. Cornett's president predicted annual shipments of up to 1,000 cars. In contrast, during the 2 years prior to Southern Pacific's application, the two defunct shippers, Certainteed Corp. and Placerville Lumber, accounted for a total of only 585 carloads. Longtime shippers also pledged increased traffic as a consequence of recovery in the lumber industry.

6.  The surcharge is the subject of a protest now pending before the ICC. *See SP II, supra,* at 1–2.

7.  Even if traffic did not increase at all over base year levels, the line would still earn a $49,000 profit after short term repair costs—$93,182 for crossing repairs and $42,000 for bridge replacement—are subtracted from net revenues.

8.  Southern Pacific projected a loss by predicting a need for "[c]onsiderably higher" maintenance costs—reflecting an increase from $47,486 in the base year to $160,631—while simultaneously predicting a drastic decline in revenues—from $1.021 million to $336,000. As the ICC recognized, these two projections are inconsistent, since Southern Pacific conceded the higher maintenance costs were only required if traffic remained steady or increased, but the railroad's dramatic drop in revenues was based on a 67% *decline* in traffic. *See SP II, supra,* at 2.

to be accurate. *See Hayfield N. R.R. Co. v. Chicago & N.W. Transp. Co.*, 467 U.S. 622, 633–34, 104 S.Ct. 2610, 2617, 81 L.Ed.2d 527 (1984).

## IV.

■ Southern Pacific contends the ICC's decision is fatally flawed by the Commission's failure to calculate the value of Southern Pacific's opportunity costs. The Commission declined to resolve the discrepancy between the railroad's estimate and that of the County because it concluded that even if Southern Pacific's estimate was accurate, "those costs would not constitute a reason to grant the abandonment." *P I, supra*, at 8. "[O]ther factors, including the profitability of the line, lack of feasible alternative transportation service, and adverse impact on the community," the Commission concluded, "outweighed the opportunity cost...." *SP II, supra*, at 3.

The ICC was not required to resolve a subsidiary issue irrelevant to the ultimate outcome.[9] Moreover, by treating Southern Pacific's estimate of opportunity costs as if it were correct, the Commission accorded it as much weight as the Commission could without treating it as dispositive, which the Commission could not do. "[O]pportunity cost is just one of the factors that must be taken into consideration in determining whether abandonment is justified. Merely because a railroad could earn greater revenue by investing its assets elsewhere does not mean that public convenience and necessity requires abandonment." *Cartersville Elevator, Inc. v. ICC*, 724 F.2d 668, 675 (8th Cir.1984) (quoting *Burlington N. R.R. Abandonment*, No. AB–6 (Sub. No. 104F) (ICC Jan. 29, 1982)).

## V.

■ Southern Pacific challenges the ICC's findings regarding adverse community impact and lack of alternative means of transportation. The ICC, which is required by statute to consider whether abandonment will create "serious adverse impact on rural and community development," 49 U.S.C. § 10903(a), had before it evidence that abandonment would threaten current industry and jobs and would derail plans for future development because alternative means of transportation were not economically feasible.

Southern Pacific pointed out that trucking and off-branch service[10] are available to El Dorado County businesses. "If the phrase 'alternative' is to have any meaning," however, "it must be interpreted to include transportation both logistically and economically feasible." *Georgia Public Serv. Comm'n v. United States*, 704 F.2d 538, 545 (11th Cir.1983). As the Commission concluded, "[a] mere statement that alternatives are available is insufficient to establish in this case that these alternatives were feasible." *SP II, supra* at 4. The Commission's conclusion is particularly well taken in light of affidavits offered by the County that the "alternatives" suggested by Southern Pacific would increase shippers' costs by as much as 30 percent and decrease revenues by as much as 10 percent—enough to force some of them out of business. *See Georgia Public Serv.*, 704 F.2d at 545–57; *Indiana Sugars, Inc. v. ICC*, 694 F.2d 1098, 1100–02 (7th Cir.1982).

## VI.

■ Where the question facing the ICC in an abandonment case is whether the injury to the affected communities outweighs the burden on the carrier, the Supreme Court has instructed the Commission to answer this question by balancing the competing interests "to decide what fairness to all concerned demands." *Colorado v. United States*, 271 U.S. at 168–69, 46 S.Ct. at 455–56. The Commission decided that fairness in this case demanded denying abandonment until the County and

---

9. This is an exercise in economy in which we frequently engage. Recent examples include *United States v. Posey*, 864 F.2d 1487, 1491 & 1494 (9th Cir.1989); *United States v. Spawr Optical Research, Inc.*, 864 F.2d 1467, 1471 (9th Cir.1988); *Walnut Properties, Inc. v. City of Whittier*, 861 F.2d 1102, 1107–08 (9th Cir.1988).

10. Off-branch service is distant rail service which shippers reach via trucks or other means.

its shippers had an opportunity to fulfill their pledge to increase shipments to a level sufficient to justify continued operation. On the record before the Commission, we cannot say this was error.

Accordingly, Southern Pacific's petition for review is denied.

KOZINSKI, Circuit Judge, concurring.

I join Judge Browning's excellent opinion, which correctly resolves this case according to established principles of administrative law. I write separately to comment on a more general problem raised by Judge Beezer's thoughtful dissent.

Judge Beezer is concerned that the ICC has accorded more weight to intangible factors (the community's future need for rail transportation) than to hard financial data (the fact that Southern Pacific could earn a greater return by investing its money elsewhere). He is also troubled because the ICC has failed to provide "a thorough explanation of why the factors of continued profitability, adverse community and shipper impact, and alternate transportation services outweigh an opportunity cost to SPT of $1,442,637 per year." Dissent at 3015. Judge Beezer's concern is well-founded, but the problem he raises is not unique to this case; it accompanies all judicial review of economic regulation.

If there were no ICC, railroads would abandon lines when they decided that they could make more money investing their resources elsewhere. Such market-based decisions allocate resources to their highest-valued use. Almost by definition, an ICC decision not to permit abandonment will be inefficient; if economic efficiency were our only concern, we would let the railroads do whatever they think best.

Once we abandon efficiency as the benchmark, it becomes very difficult, if not impossible, to come up with objectively verifiable criteria by which to review ICC decisions. The Commission must make an apples-and-oranges comparison: The community's needs and the railroad's balance sheet cannot be measured against a common standard. There is no way to tell whether an ICC decision is right or wrong

unless it is extremely wrong; indeed, the labels right and wrong lose most of their meaning. Whenever the government intervenes in the economy, government officials must weigh the benefits to one group against the harms to another. It is a rare case when the objects in the balance can be made commensurable.

This is why the courts can play only a limited role in this process. We defer to the judgment of the ICC in part because of the Commissioners' expertise, but even more so because the types of policy judgments the ICC makes are quite unlike those that courts are equipped to make. We have no standards by which to judge the ICC's determination that, in a given case, the needs of the community outweigh the railroad's interests. Accordingly, we do not—cannot—second-guess the judgment of the ICC; more active review would embroil the federal courts in questions of interest-group balancing reserved for the political branches of government.

The lack of objective standards by which to evaluate ICC decisions forces us to focus on process rather than substance. It narrows our role in another way as well: It limits the degree of rational explanation we can legitimately require from the ICC. The Commission can recite the information before it, summarize the contentions of the parties, assess credibilities and analyze the data submitted to it, but at some point it must make a policy decision whether or not to permit the abandonment. No matter how exhaustive the Commission's analysis, no matter how thorough its review of the record, its decision cannot be made to flow inexorably from a set of facts and legal principles. Regardless of how fully the facts and principles are explained, the decision remains at bottom a political one.

This is a case in point. Judge Beezer, echoing the persuasive dissents of Chairman Gradison and Commissioner Andre, finds the evidence cited by the ICC majority to be intangible and speculative. So do I. But the needs of the community will *always* be less tangible than the financial condition of the railroad; to discount intangible evidence would be to rule in the rail-

road's favor in the vast majority of cases. The ICC has balanced the tangible against the intangible, found the intangible to predominate and articulated a rational basis for that decision. We have no business asking for anything more.

BEEZER, Circuit Judge, dissenting:

Southern Pacific Transportation Co. ("SPT") petitions this court for reversal of an Interstate Commerce Commission ("ICC") order denying SPT's application to abandon a branch railroad line. I would reverse and remand, on the grounds that the ICC's decision failed to establish a rational link between facts found and decision made on two issues: Opportunity costs, and prospects for growth in traffic.

I

From Folsom Junction, California, near Sacramento, a branch railroad line winds some thirty-eight miles into the foothills of Sierra Nevada mountains to the small town of Placerville. A century ago, the line carried gold-seekers into the hills. Today, it carries more prosaic cargoes of lumber. Approximately two freight trains per week use the Placerville branch, which is serviced by SPT.

Traffic on the line has declined precipitously, from 2,500 carloads of freight in 1975 to 341 in 1986. Believing the decline irreversible, SPT filed an application with the ICC to abandon the line on December 30, 1986. Pursuant to 49 U.S.C. § 10904, the ICC has the authority to decide whether a railroad may abandon any part of its system. SPT based its application on data regarding the line's finances, and on inferences based on those data. The decline in carloads was well documented. SPT attributed the decline to general difficulties in the lumber business, and to a shift of lumber transportation to trucks. SPT made a profit on the Placerville branch of $184,019 in the base year of July 1985 through July 1986.

SPT foresaw major losses in the future for several reasons, however. First, several of its most important customers had recently ended operations or shifted entirely to trucking. Second, major maintenance was needed to keep the line operating. Third, SPT calculated large "opportunity costs." Opportunity cost is the economic loss incurred by committing assets to an inefficient use, when they could be used for other purposes generating a higher rate of return. SPT calculated its opportunity cost of continuing to operate the Placerville branch at $1,442,637 per year. SPT further asserted that the loss to Placerville businesses of abandoning service would be minimal, since Placerville enjoys good highway access, allowing goods to be trucked to (or from) Placerville directly to customers, or to the Sacramento railhead for transshipment. In short, SPT argued that it should not be required to operate an inefficient and unnecessary rail line indefinitely.

Certain shippers using, or allegedly planning to use, the Placerville branch protested the application. They were joined by the county of El Dorado, California. Some of these shippers informally projected very large increases in their use of rail transportation.

On July 27, 1987, by a three to two vote, the ICC denied SPT's application. *Southern Pacific Transp. Co.*, No. AB–12 (ICC July 27, 1987) [Hereinafter SPT I]. The ICC engaged in a balancing analysis that weighed the harm to the railroad of continued service against the harm to the community of abandonment. The ICC noted that the line was still profitable, and that projected increases in shipments could offset the loss of some major customers.

The general thrust of the ICC's opinion was that the burden of proof was on SPT, 49 U.S.C. § 10904(d)(1), and that SPT had failed to assert sufficient facts regarding its projected losses, the availability of alternate transport, and the lack of adverse community impact to meet its burden. The ICC considered opportunity costs, noting that the costs as calculated by SPT and by the protestants varied by a factor of ten, due primarily to disputes over the value of the roadbed land. The ICC did not venture into this morass to attempt to calculate opportunity cost itself; accepting SPT's

figure for the purpose of argument, the ICC held that even this cost did not outweigh the factors adverse to abandonment. Two commissioners sharply dissented on all the issues.

SPT appealed the denial administratively. The ICC considered the appeal but denied it, basically for the same reasons asserted in the original opinion. *Southern Pacific Transp. Co.*, No. AB–12 (ICC Nov. 10, 1987) [Hereinafter SPT II]. SPT timely filed a petition in this court for review of the ICC's order. We have jurisdiction. 28 U.S.C. §§ 2321, 2342(5), 2344; Fed.R.App. P. 15.

## II

The ICC long has had the power to decide whether a railroad may abandon part of its network. *See Colorado v. United States*, 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878 (1926). The ICC must apply a balancing test in which the needs of the community served are weighed against the burden on interstate commerce that results from requiring a railroad to use its resources inefficiently and unprofitably. *Id.; Cartersville Elevator, Inc. v. ICC*, 724 F.2d 668, 670 (8th Cir.), *aff'd on rehearing*, 735 F.2d 1059 (1984) (en banc). The ICC presently has the authority to approve an abandonment "only if [it] finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance." 49 U.S.C.A. § 10903(a) (Supp.1988). The statutory scheme and accompanying regulations require a decision based upon full consideration of the relevant interests of the railroad, its customers, and the communities affected. *See* 49 U.S.C.A. §§ 10903–04; 49 C.F.R. § 1152 (1988).

We review ICC decisions under the narrow "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law" standard of the Administrative Procedure Act.[1] 5 U.S.C. § 706(2)(A). The scope for review is indeed limited. Although our inquiry is to be searching and careful, we do not substitute our judgment for that of the agency. *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974). The searching and careful inquiry determines whether the agency has articulated a "rational connection between the facts found and the choice made." *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)); *see Glazer Steel Corp. v. ICC*, 748 F.2d 1006 (5th Cir.1984) (affirming ICC approval of abandonment under conditions of declining usage and high maintenance cost). We may not weigh the evidence ourselves, but must inquire into whether the agency's conclusions are rationally supported. *Bud Antle, Inc. v. United States*, 593 F.2d 865, 869 (9th Cir.1979).

## III

SPT makes several specific objections to the ICC's decision.[2] SPT first questions how the ICC could rationally have decided the case without calculating a specific figure for the opportunity cost of the branch line. Other circuits reviewing abandonment petitions have held that opportunity costs should be considered by the ICC. *International Minerals & Chem. Corp. v. ICC*, 656 F.2d 251, 259 (7th Cir.1981); *Missouri Pac. R.R. v. United States*, 625 F.2d 178, 182 (8th Cir.1980). Here, the ICC declined to determine opportunity costs. The ICC noted that the protestants' calculation of opportunity cost was $144,000, while SPT's was $1,442,637 per year. SPT I, *supra*, at 8. The ICC admitted that either figure represented a "significant" opportunity cost. It held, however, that an exact calculation was not necessary: "*Even ac-*

---

**1.** Some courts have applied the "unsupported by substantial evidence" test of 5 U.S.C. § 706(2)(E). *E.g., Texas v. United States*, 642 F.2d 87, 89 (5th Cir.1981). It is questionable whether section 706(2)(E) applies to an abandonment case, since no hearing on the record was required or held. *See Georgia Public Ser-*

*vice Comm'n v. United States*, 704 F.2d 538, 542 n. 8 (11th Cir.1983); *Illinois v. United States*, 666 F.2d 1066, 1071–72 (7th Cir.1981). I use only the "arbitrary and capricious" test.

**2.** I use "decision" to mean both SPT I and SPT II, unless indicated otherwise.

*cepting the SPT's figures.* those costs would not constitute a reason to grant the abandonment." *Id.* (emphasis added). In other words, the ICC held that an assumed $1.4 million yearly opportunity cost to SPT was outweighed by the various intangible factors mitigating against abandonment.

On appeal, the ICC repeated that it had "considered" opportunity costs, but found them to be outweighed by the adverse community impact factors. SPT II, *supra,* at 8. The ICC also severely compromised its acceptance of SPT's calculations of opportunity cost by strongly emphasizing the contrary calculations of El Dorado County. *Id.*

This treatment of opportunity cost was arbitrary and capricious. First, it is unclear, despite the ICC's apparent acceptance of SPT's figures, which ones it really relied upon, based on its continued emphasis of the protestants' lower figures and its lumping together of the various positions as "substantial." True as this may be, there is a major difference between an opportunity cost less than base year profit, and one approximately eight times greater. The factual basis for the decision was so unclear as to require reversal and remand for a better explanation of which opportunity cost was used.

Second, assuming that the ICC did accept SPT's figure of $1.4 million, the decision was not grounded by a rational explanation of its factual basis. The ICC is correct in stating that a consideration of opportunity cost need not involve a precise numerical weighing of the cost against all other factors. Data accepted by the ICC that indicate an opportunity cost of $1.4 million per year, however, require more than a conclusory response that they are "outweighed" by intangible (and, in fact, quite speculative) factors. Such a "consideration" is, in fact, no consideration at all.[3]

The only thing making this a close case is the deferential standard of review, which counsels due respect for the ICC's authority at every turn. But the ICC has failed to articulate the rational connection between facts and decision that we require to perform our reviewing function. *See Bowman,* 419 U.S. at 285, 95 S.Ct. at 441. The denial of SPT's petition should be reversed, and the case remanded for further proceedings, such proceedings to include either 1) a calculation of opportunity cost and weighing of that cost against the other relevant factors, or 2) a thorough explanation of why the factors of continued profitability, adverse community and shipper impact, and alternate transportation services outweigh an opportunity cost to SPT of $1,442,637 per year.

## IV

SPT argues that the ICC improperly ignored its evidence regarding the loss of major customers, and the resulting prospect of major financial losses. The Michigan–California Lumber Co. shipped 96 cars on the Placerville branch in 1985. In September 1986, it abandoned its spur line to the branch and began shipping exclusively by truck. The Certainteed Corp. received 266 carloads of plastic pellets in 1985, nearly half of the branch line traffic. The plant has since closed. SPT argues that these losses ripped the heart out of its business.

In response, certain of the protestants projected replacement use of the line. The Certainteed plant had been purchased by the PW Pipe Co. ("PW") and had resumed operations. PW forecast possible use of 275 carloads of freight per year. In addition, the Cornett Co. had purchased the Placerville Lumber Co. Cornett projected possible shipment of a remarkable total of 1,000 carloads annually.[4] Its predecessor,

---

**3.** The dissenting ICC Commissioners pointed out that this opportunity cost differed by orders of magnitude from that found to justify abandonment in other ICC cases.

**4.** In materials filed with the ICC in response to SPT's appeal, Cornett changed its estimate to 250 carloads per year, without any explanation of the 75 percent reduction. PW also estimated

250 carloads annually. *See SPT II, supra,* at 3–4. The ICC held that the projections were not "speculation" because the shippers had "reaffirmed" their "serious ... efforts to increase traffic." *Id.* at 4. In other words, the shippers had simply repeated their hypothetical plans to use rail transportation at some unspecified time in the future. The ICC also noted that "since

Placerville Lumber Co., shipped exactly three carloads in 1985.

The ICC accepted these projections more or less at face value. In so doing, the ICC failed to make even a minimal determination of credibility. These projections did not deserve the weight they were given— equal to, or more significant than, SPT's projection of sharply lower traffic volume as a result of the loss of major customers. SPT's estimate was based on hard data of plant closures and declining traffic. The companies projecting massive future shipments are under no financial obligation actually to live up to their promises. It is in their interest to require the line to be kept open by regulatory means for their possible future use, because they incur no costs by doing so. The ICC failed to explain why it gave these extraordinarily speculative predictions the same credence as projections backed up by a clear economic interest and by historical data.

The ICC held that SPT had failed to meet its burden of showing that these projections were inaccurate. It is difficult to see how SPT ever could do so to the ICC's satisfaction. SPT pointed out the obvious fact that these projections were pure pie-in-the-sky speculation, especially those of Cornett Co. It further showed that both Cornett and PW would have to build rail spurs to the branch line to use it at all, and that since opening their doors both have appeared quite content to truck all their shipments.

The ICC responds that since all projections are uncertain, it prefers to maintain the status quo until the level of shipments is better known. The abandonment may be approved at some future date, but once approved, the service will never be restored. The ICC has no authority to re-

quire restoration of abandoned service. *See Hayfield N. R.R. v. Chicago & North Western Transp. Co.*, 467 U.S. 622, 633–34, 104 S.Ct. 2610, 2617, 81 L.Ed.2d 527 (1984). The ICC further points out that shippers cannot be expected to invest in spur lines while the future of the branch line is in doubt.[5] The ICC's caution is therefore understandable. On the other hand, of course, requiring monetary expenditures to maintain a branch line that likely will soon be abandoned anyway is inefficient. The argument can be made endlessly that a better decision can be made at some later date. At some point, justice delayed is justice denied.

We defer to predictions based upon an agency's expertise. *See FCC v. National Citizens Comm'n for Broadcasting*, 436 U.S. 775, 813–14, 98 S.Ct. 2096, 2121, 56 L.Ed.2d 697 (1978). It is apparent from the record, however, that these predictions were not based on anyone's expertise. They were sheer speculation, unsupported by any evidence that they would ever come to pass. The ICC did not make any reasonable findings as to their credibility, or establish, in other than a merely conclusory manner, the rational link between reasonable factfinding and ultimate decision that *Bowman* requires. *Bowman*, 419 U.S. at 285, 95 S.Ct. at 441.

V

SPT next argues that the ICC gave insufficient weight to its alleged maintenance and rehabilitation costs. These costs should be considered by the ICC. *See International Minerals*, 656 F.2d at 256–58. The ICC did consider them, and found that the line would remain profitable if short-term maintenance were carried out while

SPT has not established that current operations are unprofitable, the shippers have the opportunity to increase traffic to anticipated levels." *Id.* This puzzling *non sequitur* defies logical analysis.

**5.** This argument holds SPT hostage indefinitely. As long as SPT wants to abandon service, the shippers need not invest in the improvements that would allow them to use the line. Therefore, they may merely assert that they want to use the line at some future date and, as long as

it wants to abandon, SPT can never rebut their speculative projections. SPT apparently can only prove its case for abandonment by withdrawing its application and waiting several years to see if any traffic materializes—subject, of course, to the counter-argument that if abandonment has once been attempted, the line's future *always* remains in doubt because the attempt is likely to be repeated. *See* J. Heller, *Catch-22* (1955).

"unavoidably more speculative" long-term rehabilitation was deferred. SPT's objections to this finding are insufficient to support reversal in light of our deference to agency factfinding.

## VI

The ICC found that SPT had not met its burden of demonstrating that the hardship to it of continued service outweighed the detriment to the community of abandonment. SPT contests this holding as not reasonably grounded in fact. It is true that PW and Cornett began operations while this case was under review and do not use rail at all. On the other hand, the ICC could reasonably have inferred that a loss of all rail links to Placerville would have an adverse effect on the line's remaining customers. This is a case where both sides present reasonable arguments, but differ completely in their view of the facts. In such a case we must defer to the ICC's judgment unless there was clear error, which there was not. See Texas, 642 F.2d at 89.

The same analysis applies to the dispute over alternative means of transportation. See Georgia Public Service Comm'n, 704 F.2d at 545 (alternate means of transportation must be economically feasible). SPT contended that Placerville is well served by highways connecting it to the Sacramento railhead. The ICC decided that SPT had not adequately demonstrated the economic feasibility of trucking lumber to Sacramento or elsewhere. Given the current use of trucks by most Placerville lumber companies, this decision is certainly open to question, but it is not so clearly wrong that we must reverse it.

CONCLUSION

The ICC failed to give a rational explanation for its decision that various unquantified costs to Placerville shippers outweighed $1.4 million in annual opportunity costs in the balance test. The ICC further failed to establish, by means of minimum findings as to credibility, a rational reason for its acceptance of highly speculative projections of future traffic growth.

I would reverse and remand on the issues of opportunity costs and projections of growth. The ICC should have the opportunity to make additional findings of fact as to the specific amount of opportunity cost and its relationship to the other factors mitigating against abandonment in the balance test. If the ICC prefers to continue its apparent acceptance of SPT's calculation of opportunity cost, it should better explain why a yearly cost of $1.4 million is outweighed by the stated factors. I would further remand to permit the ICC to make findings as to the credibility of the projections of future traffic provided by certain shippers, and to explain the weight accorded to such projections. I concur in the court's affirmance of the ICC's order on the other issues argued by SPT.