924 F.2d 1132
 288 U.S.App.D.C. 175
 CAJUN ELECTRIC POWER COOPERATIVE, INC., Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Gulf States Utilities Company, Louisiana Public Service
Commission, Intervenors.
 No. 90-1035.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 10, 1991.
Decided Feb. 8, 1991.
 
 Bernhardt K. Wruble, with whom J. Cathy Fogel and Terrence J. McCartin, Washington, D.C., were on the brief, for petitioner. Lisa Gefen, Washington, D.C., also entered an appearance, for petitioner.
 Katherine Waldbauer, Atty., F.E.R.C., with whom William S. Scherman, Gen. Counsel, and Joseph S. Davies, Deputy Sol., F.E.R.C., Washington, D.C., were on the brief, for respondent. Jerome M. Feit, Atty., F.E.R.C., Washington, D.C., also entered an appearance, for respondent.
 Barry S. Spector, Washington, D.C., for intervenor Gulf States Utilities Co.
 Michael R. Fontham, New Orleans, La., entered an appearance, for intervenor Louisiana Public Service Com'n.
 Before RUTH BADER GINSBURG, SILBERMAN and THOMAS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 SILBERMAN, Circuit Judge:
 
 
 1
 Cajun Electric Power Cooperative, Inc. challenges the Federal Energy Regulatory Commission's interpretation of a contract between Cajun and Gulf States Utilities Company, which was filed as a rate schedule with FERC. Cajun filed a complaint asking FERC to order enforcement of the contract pursuant to Sections 205 and 306 of the Federal Power Act, 16 U.S.C. Secs. 824d, 825e. The Commission, stating that the contract unambiguously supported Gulf States' position, denied Cajun's request for a hearing to adduce evidence regarding the contract's meaning and granted summary judgment for Gulf States. See 49 F.E.R.C. p 61,089 (1989), reh'g denied, 50 F.E.R.C. p 61,076 (1990). We believe the contract is ambiguous and therefore remand for further proceedings.
 
 I.
 
 2
 Cajun is a rural electric cooperative engaged in the generation and transmission of power to its members, thirteen "distribution" electric cooperatives. These member cooperatives in turn supply electric power to their retail customers, which include large industrial and commercial consumers. Gulf States is an investor-owned utility which owns and operates transmission and distribution facilities. These two entities had a troubled relationship stretching back to the early 1960s, when Cajun first attempted to establish itself as an alternative to Gulf States' position as the monopoly supplier of electrical power in rural Louisiana.[1] After prolonged litigation in multiple judicial and administrative fora, which both in duration and in intensity of hostilities approached that of the religious wars of the seventeenth century, a truce was reached between the combatants. The history and the outcome of these related litigations is memorialized in the Federal Pow er Commission's opinion announcing to the world the conditions of the truce and the FPC's approval of those conditions as consonant with the public interest. See Gulf States Utilities Co., 55 F.P.C. 1803 (1975). Among the terms of this latter-day Treaty of Westphalia was the requirement that the Gulf States transmission system carry electrical power (generated by Cajun's own facilities or delivered from the outside bulk power suppliers) to the individual members of Cajun and their customers. This provision was rooted in the apparent inability of Cajun to finance the construction of both generating capacity and a distribution network of its own, the inability allegedly caused by the delays resulting from the prolonged litigation with Gulf States.
 
 
 3
 Gulf States' various obligations under this provision are contained in several transmission service schedules;[2] the obligations at issue in this case were originally defined by the following provision of a Service Schedule CSTS:
 
 
 4
 To assure the applicability of all the standards and conditions for transmission service hereunder, ..., it is agreed that for purposes of this Service Schedule, all delivery points initially included in Exhibit "A" of Rate Schedule CSTS and added by mutual agreement of the parties shall be limited to delivery points on an integrated part of the system of a rural electric cooperative ... which is an active member of [Cajun].
 
 
 5
 Section 5.1.
 
 
 6
 Gulf States thus was obliged to supply the transmission services only to the members of Cajun or their customers who were specified by the schedule or added by a mutual agreement and were, in any event, within the integrated part of the system of a rural coop.[3] After this agreement was entered into, the parties began negotiating an additional agreement, which amended the 1978 contract when it was approved in 1980. It is contended that the new agreement was caused by Gulf States' desperate need for additional financing for the continuing construction of its River Bend nuclear power plant. Turning to its former foe for succor, Gulf States obtained $588 million from Cajun. To make that investment, Cajun took out loans which were guaranteed by the Rural Electrification Administration, and the REA, as a prerequisite to its guarantee, demanded the power to approve the financing/interconnection cluster of contracts before they were signed by Cajun. As part of the return on its investment, Cajun received an ownership stake in one of the Gulf States distribution systems (the so-called "backbone" system) and additional rights regarding the usage of a related distribution system. The present dispute arises over the scope of these additional usage rights, which were expressed by the following language in the Service Schedule CSTS:
 
 
 7
 If the parties fail to reach mutual agreement for [Gulf States] to furnish additional points of delivery or increases in capacity for whatever reasons, then [Cajun] shall have the option of providing the necessary distribution and transmission facilities to interconnect with [Gulf States'] existing transmission system at mutually agreeable points, subject to appropriate approvals and certifications by any regulatory authorities having jurisdiction. [Gulf States] shall have the right to contest such interconnection in any regulatory proceeding and otherwise.
 
 
 8
 Section 3.3(d) (emphasis added).
 
 
 9
 The new provision seems to be inconsistent with Section 5.1 of the same document--it would appear to give Cajun a right to insist on interconnection without Gulf States' agreement whether or not the interconnection is on a rural coop's integrated system.
 
 
 10
 One of Cajun's member cooperatives signed letters of intent to supply the power needs of two new large industrial customers which could not be served by the Cajun member's own transmission lines. After Gulf States refused to provide the transmission services necessary to enable Cajun to deliver this power, Cajun, relying on Section 5.1, filed a complaint with FERC. FERC rejected the complaint, issuing summary judgment sua sponte against Cajun, and resolving the apparent conflict between the provisions by declaring that the rights granted in 3.3(d) gave Cajun a right to build the interconnection facilities but that the facilities must still be located at points chosen by "mutual agreement" under Section 5.1. This determination preserved Gulf States' ability to prevent Cajun from offering its power to additional customers if the customers could not be served directly by Cajun's members.
 
 
 11
 The Commission refused to consider Cajun's argument that the very reason for adding Section 3.3(d) was to give Cajun additional ability to serve new customers and that this ability was a major part of the consideration Cajun obtained in return for its financing of the River Bend plant. Cajun was not permitted to put in evidence of the parties' bargaining, including the testimony of an REA officer whose affidavit supported Cajun's interpretation and even indicated that the REA had in fact demanded that Cajun be given the additional interconnection rights in return for REA's guarantee of Cajun's financing of Gulf States' project. (REA itself, however, has taken no position on the current Cajun-Gulf States controversy.) On rehearing, the Commission merely stated that "the contract is unambiguous" and "the extrinsic evidence shows, at best, that Cajun desired to contract for something else than what is provided for by the plain language of Service Schedule CSTS." 50 F.E.R.C. p 61,076 at p. 61,199. The Commission reiterates its plain meaning argument before this court.
 
 II.
 
 12
 We are confronted, at the outset, with the claim that we are obliged to defer to the Commission's interpretation of the contract under the authority of National Fuel Gas Supply Corp. v. FERC, 811 F.2d 1563 (D.C.Cir.), cert. denied, 484 U.S. 869, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987). The claim is made by the intervenor, not FERC, and we think FERC's litigating position was the wiser course.
 
 
 13
 We did hold in National Fuel that FERC's interpretation of a settlement agreement between the Commission's staff and a private party was entitled to deference. See id. at 1569-70. Relying on Chevron, we rejected the notion that because the meaning of the settlement agreement was purely a question of law we should review it de novo. We saw reasons similar to those which underlie the Chevron doctrine--that we must defer to an agency's reasonable interpretation of ambiguous legislation--supporting the same approach to agency interpretations of a settlement agreement. Perhaps most important, the settlement agreement had to be approved by FERC;[4] it was a good deal more than just an agreement between private parties and was rather more closely akin to an order of the Commission. See 811 F.2d at 1570-71. Any agreement that must be filed and approved by an agency loses its status as a strictly private contract and takes on a public interest gloss, see A/S Ivarans Rederi v. United States, 895 F.2d 1441, 1447 (D.C.Cir.1990). That means that when the agency reconciles ambiguity in such a contract it is expected to do so by drawing upon its view of the public interest. And, therefore, the agency to which Congress entrusted the protection and discharge of the public interest is entitled to just as much benefit of the doubt in interpreting such an agreement as it would in interpreting its own orders, see City of Angels Broadcasting v. FCC, 745 F.2d 656, 661 (D.C.Cir.1984), its regulations, see TransCanada Pipelines Ltd. v. FERC, 878 F.2d 401, 411 (D.C.Cir.1989), or its authorizing statute, see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984).
 
 
 14
 Benefit of the doubt, however, implies as a precondition a legitimate doubt, or, in legal terms, an ambiguity. It is only after the first step of the Chevron analysis--when it is determined that legislation is ambiguous--that we examine an agency's interpretation under the deferential "reasonable" standard. See id. We have always seen the first step as one conducted under de novo review. An agency is given no deference at all on the question whether a statute is ambiguous, and if an agency erroneously contends that Congress' intent has been clearly expressed and has rested on that ground, we remand to require the agency to consider the question afresh in light of the ambiguity we see. See Baltimore & Ohio R.R. v. ICC, 826 F.2d 1125, 1128-29 (D.C.Cir.1987).
 
 
 15
 The same kind of reasoning must apply when an agency is interpreting its own regulation, an agency order, or a contract approved by an agency. In any of these situations, if an agency decision turns on an erroneous assertion that the plain language of the relevant wording is unambiguous we must remand.
 
 III.
 
 16
 The original provision dealing with those circumstances under which Cajun's cooperatives were entitled to connect to and thereby use Gulf States' transmission system--Section 5.1--would seem to confine Cajun to those delivery points set forth in Exhibit A and added by mutual agreement so long as they are limited to "delivery points on an integrated part of the system of a ... cooperative." On the other hand, the later amendment, Section 3.3(d), would appear to lift the overall limitation of the boundaries of a cooperative's integrated system by stating that "if the parties fail to reach mutual agreement to furnish additional points of delivery ... for whatever reasons, then Cajun shall have the option" (emphasis added) of providing the necessary distribution and transmission facilities to interconnect with Gulf States' existing transmission system. To be sure, the clause goes on to say rather confusingly that this new right given to Cajun to interconnect with Gulf States' transmission system shall be at mutually agreeable points. It would appear at least arguable, however, that the parties agreed to some significant relaxation of the original "integrated part of the system" boundary, as is further suggested by the concluding clause that Gulf States shall have the right to contest such interconnection in any regulatory proceeding and otherwise--a litigating safety valve which would obviously be unnecessary if the original limitations of Section 5.1 were maintained.[5]
 
 
 17
 The two provisions are both included in the contract without any cross-references--which in our view certainly creates ambiguity. The Commission's determination to the contrary is based on a rather strained reading of Section 3.3(d). According to the Commission, the new right Cajun gained is only the authority to build the interconnection if Gulf States agreed to a new point of interconnection but refused to construct the facilities. It is rather difficult to understand why Gulf States would ever agree (when it was not required to do so) to a new point of interconnection and then refuse to build the facilities to accomplish the interconnection--particularly since the full cost of construction would always be charged back to Cajun. It is perhaps even more difficult to understand why Cajun would bargain for such a meaningless provision. The Commission's reconciliation of the apparent tension created by the continued coexistence of the two clauses may have the virtue of giving meaning to all parts of the contract simultaneously, but it does so in form only, by apparently drawing all substance out of Section 3.3(d).[6]
 
 
 18
 The Commission's cursory treatment of Cajun's claim simply will not do. The grant of "summary judgment" based on the notion that this contract unambiguously favors Gulf States seems at least high-handed and perhaps driven by regulatory policy considerations not apparent on this record.[7] We remand to the Commission for further proceedings, including a hearing in which Cajun should have the opportunity to show whatever evidence it may adduce that is probative as to the intent of the parties. The sources properly used for the reconciliation of ambiguity, of course, differ depending on the nature of the legal document sought to be interpreted. In the case of legislation, traditionally courts and agencies look to a greater or lesser degree to the structure of the statute as well as legislative history. In a similar fashion, we look to the background of negotiations between the parties to help resolve contractual ambiguity. Petitioner argues before us that the agency refused to consider the negotiating background--including the role of the REA in negotiations--which it asserts would establish that any ambiguity in the contract should be resolved in its favor. The Commission rests on its assertion that the contract is free of ambiguity so it is wholly unnecessary to take that step.[8] For reasons discussed above, we think the agency was in error; the contract language is ambiguous and the Commission should have inquired further by permitting petitioner to put in evidence of the negotiating background. If after these proceedings it still can be said that the parties never meant squarely to address the issue raised by this dispute, then the Commission is entitled to place its own construction on the resultant ambiguity--so long as it is reasonable. Cf. Chevron, 467 U.S. at 844, 104 S.Ct. at 2782.
 
 
 19
 * * * * * *
 
 
 20
 Accordingly, we remand to the Commission for proceedings not inconsistent with this opinion.
 
 
 
 [1]
 Under Louisiana law, the electric utilities may serve a new customer in any area if the point of connection of the customer is 300 feet beyond the lines of other utilities serving the area. See La.Rev.Stat.Ann. Sec. 45:123 (West Supp.1989); Dixie Elec. Membership Corp. v. Louisiana Public Serv. Comm'n, 441 So.2d 1212 (La.1983). This unusual provision allows electrical utilities to compete for new customers on the retail level. The owner of the transmission lines carrying the power from the generating plant to the retailer--such as Gulf States--can impede this competition by refusing to transmit the power to the retailer-competitor
 
 
 [2]
 The original contract was signed in 1978, amended in 1980, and re-entered into (as amended) in 1987. All agreements were filed with and approved by the Commission
 
 
 [3]
 Due to our disposition of this case, we do not reach the issue of the precise meaning of "the integrated part of the system," which is disputed by the parties
 
 
 [4]
 The contract in this case also required the Commission's approval before going into effect, see 16 U.S.C. Sec. 824d
 
 
 [5]
 Cajun claims that the "mutually agreeable" clause refers only to the technical possibility of constructing the interconnection facility at designated points, and that Gulf States' right to oppose interconnection merely assures that other provisions of the contract--such as the no-discrimination clause--are not violated over Gulf States' objections
 
 
 [6]
 If FERC were correct as to the right granted by the 1980 agreement, it would follow that under the pre-1980 contract Cajun had no ability to use even points of interconnection listed on Exhibit A because Gulf States could have refused to permit construction of the necessary facilities. That seems rather peculiar, to say the least
 
 
 [7]
 We do hope that the Commission's contention that Cajun's request for a summary judgment allows the Commission to rule summarily against Cajun, see 50 F.E.R.C. p 61,076 at p. 61,199 n. 17, represents a piece of legal reasoning which FERC will eschew in the future. Cf. Walling v. Richmond Screw Anchor Co., 154 F.2d 780, 784 (2d Cir.), cert. denied, 328 U.S. 870, 66 S.Ct. 1383, 90 L.Ed. 1640 (1946) (if one party moves for a summary judgment on its theory, it cannot be precluded from showing a dispute about a material fact under the other party's theory)
 
 
 [8]
 We do not know what to make of the Commission's assertion on rehearing that even if it considered the extrinsic evidence, it would not change its decision. See 50 F.E.R.C. p 61,076 at p. 61,199. That argument seems to be based on the assumption of absolute clarity of the contractual language, an assumption which we reject here